# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00078-CR

**Raymond Merrill Jessop, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF SCHLEICHER COUNTY, 51ST JUDICIAL DISTRICT
NO. 991, THE HONORABLE BARBARA L. WALTHER, JUDGE PRESIDING**

## O P I N I O N

Appellant Raymond Merrill Jessop and nine other members of the Fundamentalist Church of Jesus Christ of Latter Day Saints (FLDS), living at the YFZ (Yearning for Zion) Ranch in Schleicher County, Texas, were indicted for sexual assault of a child.[1] *See* Tex. Penal Code Ann. § 22.011(a)(2)(A) (West 2011). Subsequently, a jury convicted appellant and assessed his punishment at confinement for ten years in the Institutional Division of the Texas Department of Criminal Justice and, in addition, assessed an $8,000 fine. *See id.* § 12.33 (West 2011). This appeal followed. Appellant brings forward thirty-five points of error. We affirm the judgment of conviction.

---

[1] Some of the other individuals were also indicted for bigamy. Appellant, however, was charged only with sexual assault of a child.

**FACTUAL AND PROCEDURAL BACKGROUND**

The factual and procedural background of this case are fully discussed in prior opinions of this Court, most recently in our opinion in *Jeffs v. State*, No. 03-10-00272-CR, 2012 WL 601846, at *1-4 (Tex. App.—Austin Feb. 24, 2012, no pet. h.) (mem. op., not designated for publication), and will not be repeated here. We discuss further background details only as necessary to address the points of error raised by appellant in this appeal.

**DISCUSSION**

**I. SUFFICIENCY OF THE EVIDENCE**

In his first two points of error, appellant challenges the sufficiency of the evidence. First, he asserts that the evidence is insufficient to support his conviction for sexual assault of a child because the State failed to prove the element of penetration. Second, he contends that the evidence is insufficient because it fails to demonstrate that the sexual assault occurred in Texas.

***Additional Background***

Appellant, a lifelong member of FLDS, moved to the YFZ Ranch in Schleicher County, Texas, in December 2003 with his family—including multiple "celestial wives" and numerous children—and lived with them in a single residence on the ranch. On August 12, 2004, appellant was "sealed" in a spiritual or celestial marriage to J. Jessop, a female FLDS member born September 16, 1988, who had also moved to the YFZ Ranch in December 2003. The ceremony took place at the "prophet's" house on the ranch in Schleicher County when J. Jessop was 15 years old and appellant was 32. Following the celestial marriage ceremony, appellant and J. Jessop lived

2

together in the same household, purportedly as husband and wife. On August 15, 2005, when she was 16 years old, J. Jessop gave birth on the ranch to a daughter. DNA testing confirmed that appellant was the biological father of the child.[2]

Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011). When reviewing the sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). The sufficiency of the evidence is measured by reference to the elements of the offense as defined by a hypothetically correct jury charge for the case. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

In determining the legal sufficiency of the evidence, we must consider all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or the defense. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Moff v. State*, 131 S.W.3d 485, 489-90 (Tex. Crim. App. 2004); *Allen v. State*, 249 S.W.3d 680, 688-89

---

[2] While the DNA evidence is discussed in detail in subsequent points of error, we note here that DNA testing reflected that appellant's DNA profile matched the child's DNA profile at all 15 genetic markers analyzed. Statistical analysis of the DNA test results indicated that appellant could not be excluded as the biological father of the child, while 99.99997% of the male population was excluded as the child's father. In addition, the genetic results are 57,040,000 times more likely if appellant is the child's biological father than if a randomly selected unrelated male of his race is the father. Further, the likelihood appellant is the child's biological father is 99.999998% as compared to an untested randomly chosen male of his race.

(Tex. App.—Austin 2008, no pet.). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *see Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). A legal-sufficiency review requires us to defer to the jury's determinations of the witnesses' credibility and the weight to be given their testimony. *Brooks*, 323 S.W.3d at 899. When faced with a record of historical facts that supports conflicting inferences, we must presume that the trier of fact resolved any such conflicts in favor of the verdict and must defer to that resolution. *Jackson*, 443 U.S. at 326; *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010). The jury, as exclusive judge of the facts, is entitled to weigh and resolve conflicts in the evidence and draw reasonable inferences therefrom. *Clayton*, 235 S.W.3d at 778; *see* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979). In assessing the legal sufficiency of the evidence, we have a duty to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010).

### *Evidence of Penetration*

Appellant was charged with the offense of sexual assault of a child. *See* Tex. Penal Code Ann. § 22.011 (a)(2)(A), (c)(1),(2). The State alleged in the indictment, and had the burden to prove, that appellant intentionally or knowingly caused the penetration of the female sexual organ of "J. Jeffs Jessop," a child younger than 17 years of age who was not the spouse of appellant, with appellant's sexual organ. In his first point of error, appellant argues that the evidence is insufficient

to prove penetration. He complains that the State's evidence was largely circumstantial and failed to eliminate the possibility that J. Jessop could have become pregnant by artificial insemination.[3] He points to the lack of testimony from J. Jessop as support for this contention.

The lack of direct evidence is not dispositive of the issue of appellant's guilt. The State is not required to present direct evidence to establish guilt. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004); *Sanders v. State*, 346 S.W.3d 26, 32 (Tex. App.—Fort Worth 2011, pet. ref'd). Indeed, circumstantial evidence is as probative as direct evidence in establishing guilt and may alone be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Sanders*, 346 S.W.3d at 32. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *see Guevara*, 152 S.W.3d at 49; *Sanders*, 346 S.W.3d at 32. The standard of review on appeal is the same for both direct and circumstantial evidence cases. *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010); *Hooper*, 214 S.W.3d at 13; *Guevara*, 152 S.W.3d at 49.

Moreover, it is not incumbent upon the State to exclude "every reasonable hypothesis other than guilt" for the evidence to be considered sufficient.[4] *Geesa v. State*, 820 S.W.2d 154,

---

[3] Specifically, appellant argues that the birth of a baby alone is not sufficient to establish penetration because J. Jessop "could have used a turkey baster on herself." He did not offer evidence that J. Jessop became pregnant by some act other than sexual intercourse with him. Nor did he present his theory of artificial insemination by turkey baster to the jury in any way.

[4] In *Geesa v. State*, the Texas Court of Criminal Appeals expressly disavowed the "reasonable hypothesis analytical construct" for legal-sufficiency reviews. *See Geesa v. State*, 820 S.W.2d 154, 159 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000).

157-61 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570, 571 (Tex. Crim. App. 2000); *Sanders*, 346 S.W.3d at 32; *Villarreal Lopez v. State*, 267 S.W.3d 85, 97-98 (Tex. App.—Corpus Christi 2008, no pet.) (citing *Harris v. State*, 133 S.W.3d 760, 763-65 (Tex. App.—Texarkana 2004, pet. ref'd)); *see Orona v. State*, 836 S.W.2d 319, 322 (Tex. App.—Austin 1992, no pet.) ("*Geesa* rightfully abolished the logically inconsistent requirement in a circumstantial-evidence case that a legal-sufficiency review, in which the appellate court must view the evidence in the light most favorable to the prosecution, must also negate the existence of any alternate reasonable hypothesis inconsistent with the defendant's guilt.").

In a prosecution for sexual assault of a child, penetration may be proven by circumstantial evidence. *See Villalon v. State*, 791 S.W.2d 130, 133 (Tex. Crim. App. 1990); *Nilsson v. State*, 477 S.W.2d 592, 595 (Tex. Crim. App. 1972); *Belt v. State*, 227 S.W.3d 339, 342 (Tex. App.—Texarkana 2007, no pet.); *Quinton v. State*, 56 S.W.3d 633, 641 (Tex. App.—Waco 2001, pet. ref'd). There is no requirement that the child victim testify about penetration. *Villalon*, 791 S.W.2d at 133; *Nilsson*, 477 S.W.2d at 596. Evidence of the slightest penetration is sufficient. *Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992); *see Nilsson*, 477 S.W.2d at 595.

At trial, the jury received evidence that both appellant and J. Jessop moved to the YFZ Ranch in Schleicher County, Texas, in December 2003. The evidence showed that appellant was sealed to J. Jessop in a celestial or spiritual marriage for "time and eternity" in August 2004 in a ceremony that was performed on the YFZ Ranch when she was 15 years old.[5] Evidence further

---

[5] Testimony showed that celestial or spiritual marriages in FLDS were religious unions not recognized as legal marriages by the state. A certified copy of a Utah marriage certificate reflected that appellant was already legally married to Mary J. Musser at the time he entered into this spiritual

showed that after the marriage ceremony, appellant and J. Jessop lived together in the same household, purportedly as husband and wife, including engaging in a sexually intimate relationship.[6] Finally, the evidence showed that one year after being sealed in a spiritual marriage with appellant, J. Jessop gave birth to a daughter when she was 16 years old. Additional evidence documented the birth of a baby girl in August 2005 to "Raymond and [J.] Jessop." DNA testing also established that appellant was the biological father of her child.[7]

A fact finder may support its verdict with reasonable inferences drawn from the evidence. *Laster*, 275 S.W.3d at 523; *Hooper*, 214 S.W.3d at 14. Jurors are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence. *Obigbo v. State*, 6 S.W.3d 299, 306 (Tex. App.—Dallas 1999, no pet.); *Jones v. State*, 900 S.W.2d 392, 399 (Tex. App.—San Antonio 1995, pet. ref'd); *Wawrykow v. State*, 866 S.W.2d 87, 88 (Tex. App.—Beaumont 1993, pet. ref'd); *see Saenz v. State*, 976 S.W.2d 314,

---

marriage with J. Jessop.

[6] Evidence demonstrated that a celestial marriage was a significant, if not the most significant, event in the life of a girl in FLDS. She was placed in such a relationship when the "prophet" deemed her worthy, regardless of her age. After such a marriage, the girl was placed in the household of her husband who became her new priesthood head. According to FLDS doctrine and teachings, women have no connection to God but could only obtain such a connection through their priesthood head. Pursuant to church practices, girls had no contact with the opposite sex prior to marriage. Throughout their lives, the girls receive continuous training on what FLDS deems the proper relationship between a wife and her husband, including training on sexual relations.

[7] Although appellant contested the statistical representation of the DNA testing, he offered no controverting evidence regarding the fact that his DNA profile contained all of the obligate paternal alleles of the true biological father of the child.

322 (Tex. App.—Corpus Christi 1998, no pet.) ("Jurors are expected to draw upon their own experiences and common knowledge and apply them to the facts at hand.").

In this case, the circumstantial evidence of penetration is compelling. Using common sense and common knowledge, the jurors could rationally conclude that appellant and J. Jessop, as spiritual husband and wife, were involved in a sexually intimate relationship, one including sexual intercourse, that resulted in the conception of their daughter. Accordingly, viewing the evidence in the light most favorable to the verdict and with proper regard for the jury's power to resolve conflicts, evaluate credibility, and weigh the evidence, a rational trier of fact could have found beyond a reasonable doubt that appellant intentionally or knowingly caused the penetration of J. Jessop's sexual organ with his sexual organ when she was younger than 17. *See Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778; *see also* Tex. Penal Code Ann. § 22.011. Therefore, we hold that the evidence of penetration is legally sufficient. We overrule appellant's first point of error.

### *Territorial Jurisdiction*

In his second point of error, appellant contends that the evidence is insufficient to prove territorial jurisdiction. He argues that the evidence is insufficient to demonstrate that appellant's sexual assault of J. Jessop occurred in Texas because the direct evidence fails to show that the sexual act resulting in the conception of the child took place in Texas.[8]

---

[8] Appellant suggests that the State's proof failed because it did not demonstrate "beyond a reasonable doubt that during the three minutes it took to conceive that child, both of those people were in Texas or even having sexual intercourse and not somewhere else undergoing artificial insemination."

8

Texas has jurisdiction over an offense if the conduct constituting the offense occurs inside this state. *See* Tex. Penal Code Ann. § 1.04(a)(1) (West 2005). Jurisdiction can be established by circumstantial evidence. *Vaughn v. State*, 607 S.W. 2d 914, 920 (Tex. Crim. App. 1980); *Gunter v. State*, 327 S.W.3d 797, 799-800 (Tex. App.—Fort Worth 2010, no pet.); *see, e.g.*, *Walker v. State*, 195 S.W.3d 250, 257-58 (Tex. App.—San Antonio 2006, no pet.); *James v. State*, 89 S.W.3d 86, 89 (Tex. App.—Corpus Christi 2002, no pet.). It is unclear whether the State must prove territorial jurisdiction beyond a reasonable doubt or by a preponderance of the evidence. *See Torres v. State*, 141 S.W.3d 645, 654 (Tex. App.—El Paso 2004, pet. ref'd). Regardless of which standard is applied, we conclude that the evidence is legally sufficient to establish territorial jurisdiction in Texas.

The circumstantial evidence—viewed in the light most favorable to the verdict and with proper respect for the jury's power to resolve conflicts, evaluate credibility, and weigh the evidence—showed that appellant and J. Jessop lived together in a sexually intimate relationship as spiritual husband and wife on the YFZ Ranch in Schleicher County, Texas, prior to, during, and after the birth of their child. We hold that this is sufficient circumstantial evidence to support a finding by a jury beyond a reasonable doubt that appellant sexually assaulted J. Jessop in Texas.[9] *See Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778; *see also Geesa*, 820 S.W.2d at 155, 161. Therefore, the evidence is sufficient to prove that Texas has territorial jurisdiction. We overrule appellant's second point of error.

---

[9] Because we find the evidence legally sufficient under the more stringent beyond-a-reasonable-doubt standard, it would also be sufficient under the preponderance-of-the-evidence standard.

## II. DNA EVIDENCE

In his next three points of error, appellant contends that the trial court erred by admitting DNA evidence of his paternity of J. Jessop's child. He first argues that the DNA evidence was not sufficiently reliable scientific evidence. In addition, he asserts that the admission of the DNA evidence violated the presumption of innocence and shifted the burden of proof because one of the statistics used to express the results of the DNA testing used a calculation that employed a 0.5 prior paternity presumption. Appellant also claims that the admission of the testimony about the DNA evidence violated his right to confront witnesses against him.

### *Standard of Review*

We review a trial court's ruling on the admissibility of expert testimony for an abuse of discretion. *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). Such rulings will rarely be disturbed by an appellate court. *Vela v. State*, 209 S.W.3d 128, 136 (Tex. Crim. App. 2006); *Rodgers v. State*, 205 S.W.3d 525, 527-28 n.9 (Tex. Crim. App. 2006). As with other types of evidentiary rulings, we will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Layton*, 280 S.W.3d at 240 (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh'g)). If the record supports the trial court's decision on the admission of evidence, there is no abuse of discretion. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *Montgomery*, 810 S.W.2d at 379; *Marsh v. State*, 343 S.W.3d 475, 478 (Tex. App.—Texarkana 2011, pet. ref'd).

## *DNA Paternity Testing*

After testifying about her background and experience, Amy Smuts, a DNA forensic analyst from the University of North Texas Health Science Center at Fort Worth, described the basic process of DNA testing: extraction, amplification, detection, and comparison. Smuts explained that the DNA is first extracted from the sample. The analyst then amplifies the original DNA so there is more to work with. Next, the analyst uses an instrument to visualize or detect a pattern or profile that can be compared to different samples. Finally, the analyst compares the genetic profile from an unknown sample to the genetic profile from a known sample for DNA identification or, in a forensic paternity test, compares the genetic profiles of a mother, a child, and an alleged father.

The record reflects that DNA paternity testing differs from DNA identification analysis only as to the final step of how the test results are used—that is, the comparison the analyst makes after generating the DNA profiles. Smuts testified that the scientific principles underlying DNA analysis and the procedures she outlined are accepted in the scientific community as valid. She indicated that the scientific principles underlying DNA paternity testing are the same scientific principles underlying DNA identification analysis. She further testified that the scientific principles underlying DNA paternity testing and the procedures used are accepted as reliable in the scientific community.

During the comparison for DNA paternity testing, the analyst first compares the DNA profiles of the child, mother, and alleged father to determine if the alleged father can be excluded as the biological father. A child inherits two different alleles at each genetic marker—one from the

11

mother and one from the father.[10]  At a particular genetic marker, a child and its mother will always have at least one allele with matching values.  The child's *other* allele at that locus—the "obligate allele"—must have come from the biological father.[11]  The exclusion analysis examines a number of genetic markers and excludes the alleles that match between the mother and the child.[12] According to Smuts, only the true biological father will have the obligate paternal allele at every locus.[13]  The result of this initial comparison is either an exclusion—the alleged father is not the biological father—or an inclusion.  To be excluded, the alleged father must not match at two or more alleles.  However, to be included the alleged father must have matching alleles at each locus.[14]

If an alleged father cannot be excluded, the analyst conducts a statistical analysis using the genetic profiles.  In performing the statistical analysis, Smuts testified that the lab uses the

---

[10]  An allele is one member of a pair of genes occupying a specific position on a chromosome that controls the same trait or inheritance characteristic.  A genetic marker, or locus, is a chromosomal location or site within a DNA sequence of interest.

[11]  For example, at one genetic marker the mother might, hypothetically, have alleles with values 12 and 18.  If the child has alleles with values of 18 and 21 at that same genetic marker, the "21 allele" is the "obligate allele" from the biological father.  The alleged father's DNA is examined to see if he has an allele with a value of 21 at that particular genetic marker.

[12]  Smuts testified that the standard practice is to make the comparison analyzing the standard 13 genetic markers, commonly referred to as the CODIS core loci.  Her lab, however, makes the comparison for paternity testing using 15 genetic markers—the 13 CODIS core loci plus two additional loci.

[13]  An exception exists in the case of identical twins, who have the same genetic profile.

[14]  If the alleged father's profile matches alleles at only 14 loci, the alleged father can neither be included nor excluded because the results are deemed inconclusive.

FBI allele frequency database in the calculations to quantify the results.[15] She testified that labs all over the country use the FBI database to quantify the results of the DNA comparison, that the database is accepted within the scientific community as valid, and that the use of the database is accepted in the scientific community as reliable. The statistical values representing the DNA test results are reported in three ways: the probability of exclusion, the combined paternity index, and the probability of paternity.

The first statistical value calculated, the "probability of exclusion," considers the genetic profiles of only the mother and child, and is defined as the probability of excluding a random individual from the relevant population given the alleles of the child and mother. The probability of exclusion utilizes an established population database,[16] such as the FBI database, and reflects the strength of the DNA test by showing the percentage of the male population that would have been excluded by the test. The probability of exclusion is equal to the frequency of all men in the population who do not contain alleles that match the obligate paternal alleles of the child at all genetic markers analyzed. It is the percentage of the male population that cannot have contributed the obligate paternal alleles to the child at all tested loci, or, more simply, the percentage of the male population that is excluded as the biological father.

---

[15] The FBI database lists the frequency distribution of individual alleles. Allele frequency is a measure of the relative frequency of an allele value on a genetic locus in a population. The FBI database measures the allele frequency for various racial populations, including the Caucasian population, the African-American population, and the Southwest-Hispanic population.

[16] Population databases allow for estimations of how rare or common a DNA profile may be in a particular population. At any given genetic marker, some allele values are more common than others.

The next statistical expression of the DNA test results is the "combined paternity index." An individual paternity index number is a calculated value generated for a single genetic marker or locus and is associated with the statistical strength or weight of that locus in favor of or against paternity given the alleles of the tested participants and the science of inheritance. The paternity index calculations utilize allele frequencies generated from established population databases, such as the FBI database. The paternity index reflects the likelihood that the tested man passed the required allele (at a specific genetic marker) to the child as compared to an untested man of the same race. The individual paternity index values for all examined loci are then multiplied to calculate the *combined* paternity index. The combined paternity index—the product of multiplying all the individual paternity index numbers of the examined alleles together—is a summary of the genetic evidence of a match between the tested man and the child. The number reflects that the observed genetic results are that many times more likely if the tested man is the true biological father than if an untested randomly selected male of his race was the father. Thus, the combined paternity index is a measure of the strength of the genetic evidence and is an odds ratio, not a probability, that depicts the likelihood of the tested man being the biological father, as compared to the likelihood of a random unrelated man in the population being the biological father.[17]

Finally, the DNA test results can be expressed as a "probability of paternity." The probability of paternity translates the combined paternity index into a percentage. The probability

[17] As a ratio, the combined paternity index can be expressed as a frequency of occurrence. For example, if the combined paternity index is 1,000, the DNA paternity test results can be stated as a frequency of occurrence as follows: "one individual in 1,000 has the same genetic pattern as the tested man."

14

of paternity is a computation that tests the hypothesis that the alleged father is indeed the biological father of the child.[18] This statistic is calculated using the combined paternity index in a mathematical formula along with another variable called a "prior probability," which represents the social non-genetic evidence.[19] The formula requires the use of a prior probability of an event occurring, but since genetic labs do not have access to or interest in non-genetic evidence, they seek to utilize a neutral prior-probability value. Smuts testified that it is standard for paternity testing labs to use a value of 0.5 for the prior paternity because, being at the mid-point of possible values, it translates into a neutral assumption—paternity and non-paternity have equal weight. The 0.5 prior probability is the statistical expression of the proposition that the tested man either is or is not the biological father, without giving greater weight to either possibility. The probability of paternity is often characterized as a percentage reflecting the percent likelihood that the tested male is actually the father of the child.

---

[18] For example, a probability of paternity of 95% means that there is a 95% chance that the hypothesis—that the alleged father is the true biological father—is true and a 5% chance that it is not true.

[19] Prior probability is typically based on the testimony of the mother, the father, and other witnesses. The value of prior probability can range from "0" (impossibility) to "1" (certainty) and represents a subjective assessment of the possibility of paternity based on the non-genetic evidence. The formula is based on Bayes' Theorem, a method of statistical inference first devised by the English clergyman-scientist Thomas Bayes in 1763. Bayes' Theorem uses a mathematical formula to determine conditional probabilities and is necessary to convert probabilities into percentages. *See Griffith v. State*, 976 S.W.2d 241, 251 (Tex. App.—Amarillo 1998, pet. ref'd); *Davis v. State*, 476 N.E.2d 127, 138 (Ind. App. Ct. 1985).

### *Appellant's Test and the Results*

Law enforcement officers collected buccal swab samples from the mother, J. Jessop, the victim in this case, and her child, Z.J., and a blood sample from appellant. The samples were taken to the University of North Texas Health Science Center at Fort Worth, where DNA tests were performed.[20] The record reflects that the samples in this case were processed in a team approach routinely used in the lab. Amy Smuts processed the samples of the mother and child while Christina Capt, another forensic analyst at the lab, processed appellant's blood sample. Smuts testified about the results of the DNA tests on the samples from mother and child and, based on the testing done by Capt, the resulting statistical analysis. Capt subsequently testified regarding the DNA results of the test on appellant's blood sample. Smuts testified that 15 genetic markers were examined. She went through each of the 15 loci tested for all three genetic profiles, explaining how the obligate paternal alleles were determined. She testified, and demonstrated to the jury, that appellant's profile contained all of the obligate paternal alleles—that is, appellant's DNA profile matched alleles with Z.J.'s DNA profile at all 15 loci. Consequently, appellant could not be excluded as the biological father of the child.

Because appellant was not excluded, the previously described statistics were generated to express the DNA results. The probability of exclusion was 99.99997 percent. In other words, based on the DNA profiles of J. Jessop and her child, 99.99997 percent of the male

---

[20] The record reflects that two sets of buccal swab samples from the mother and child were submitted to the lab, though the record does not reflect why two separate sets of samples were submitted for testing. The lab conducted DNA testing on both sets. The results of the tests on both sets of samples were the same.

population could not have contributed the obligate paternal alleles at all 15 loci and are excluded from the possibility of being Z.J.'s biological father. The combined paternity index was 57,040,000. This means that the observed genetic results are 57,040,000 times more likely if appellant is Z.J.'s true biological father than if an untested randomly selected unrelated male of his race is the father.[21] The probability of paternity was 99.999998 percent, reflecting a 99.999998 percent likelihood that appellant is actually the father of Z.J. as compared to an untested randomly chosen male of his race. The focus of appellant's complaints at trial, and now on appeal, relate to this third statistical figure because the calculation utilizes a 0.5 prior probability of paternity in the formula.

### *Reliability of DNA Paternity Evidence*

Pursuant to Rule 702, before admitting expert testimony, the trial court must be satisfied that three conditions are met: (1) that the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) that the subject matter of the testimony is appropriate for expert testimony; and (3) that admitting the expert testimony will actually assist the fact finder in deciding the case. *Vela v. State*, 209 S.W. 3d 128, 131 (Tex. Crim. App. 2006); *see also Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000). These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Vela*, 209 S.W.3d at 131. Reliability focuses on the subject matter of the witness's testimony. The proponent of the expert testimony must demonstrate by clear and convincing evidence that the expert testimony is reliable. *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005).

---

[21] Expressing this number as a frequency of occurrence: one male in 57,040,000 has the same genetic pattern as appellant.

To be considered sufficiently reliable as to be of help to a jury, scientific evidence must meet three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Vela*, 209 S.W.3d at 134; *see Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Factors that could affect a trial court's determination of reliability include, but are not limited to: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573.

The record in this case demonstrates that the State satisfied the three criteria to establish the reliability of the DNA paternity evidence. DNA evidence has certainly been held admissible in Texas.[22] *See Jackson*, 17 S.W.3d at 672; *Campbell v. State*, 910 S.W.2d 475, 478-79 (Tex. Crim. App. 1995); *Hicks v. State*, 860 S.W.2d 419, 423-24 (Tex. Crim. App. 1993), *overruled on other grounds by Rosales v. State*, 4 S.W.3d 228 (Tex. Crim. App. 1999); *Kelly*, 824 S.W.2d at

---

[22] Even prior to *Kelly*, DNA evidence was held to be admissible. *See Mandujano v. State*, 799 S.W.2d 318, 321-22 (Tex. App.—Houston [1st Dist.] 1990, no pet.); *Glover v. State*, 787 S.W.2d 544, 547 (Tex. App.—Dallas 1990), *aff'd*, 825 S.W.2d 127, 128 (Tex. Crim. App. 1992).

573. In addition, Smuts testified that the underlying scientific theory of DNA analysis is valid and that the technique applying the theory is valid; that the scientific community considers DNA analysis an accepted science; and that the procedures used in DNA testing are accepted in the scientific community as valid. Smuts also testified that DNA paternity testing, based on the same scientific principles and techniques, is similarly accepted within the scientific community as valid. Further, Smuts testified that the statistical expression of the DNA results is accepted within the scientific community. She testified that the FBI database used in calculating the probability of exclusion, paternity indexes, and combined paternity index is used by labs throughout the country and that the use of the FBI database is accepted within the scientific community. In addition, she testified that the formula for calculating the probability of paternity, including the 0.5 prior probability, is used by paternity labs throughout the country. Finally, the record reflects that Smuts and Capt properly applied the techniques of DNA paternity testing in this case.

In his third point of error, appellant asserts that the DNA evidence identifying him as Z.J.'s father was not sufficiently reliable.[23] However, he fails to articulate why the evidence was unreliable or how the State failed to establish its reliability. Appellant does not challenge the science behind general DNA testing or the validity of general DNA testing procedures. Nor does he challenge the science behind DNA paternity testing. In fact, during the 702 hearing, defense counsel explicitly told the trial judge that he was "not arguing that DNA testing is not a valid way to establish

---

[23] The three requirements of expert testimony—qualification, reliability, and relevance—raise distinct questions and issues. At trial, however, appellant merged these issues in his objections to the trial court. He continues to merge these issues on appeal. In addition, appellant combines the argument for all three of his complaints about the admission of the DNA evidence into one argument, making it difficult to discern the precise nature of his arguments.

paternity." Appellant's attack on the reliability of the DNA evidence is, primarily, a challenge to the calculation of the statistical expression of the DNA results in the probability-of-paternity statistic, which appears to be a challenge to the validity of DNA paternity testing procedures. He argues that the DNA evidence was unreliable because Smuts could not explain "the science behind the use of Bayes' Theorem" in the formula of her statistical calculation of probability of paternity.[24] However, the State is not required to present an expert on probability and statistics in order to show that DNA testing is reliable. *Roberson v. State*, 16 S.W.3d 156, 168 (Tex. App.—Austin 2000, pet. ref'd); *Griffith v. State*, 976 S.W.2d 241, 251 (Tex. App.—Amarillo 1998, pet. ref'd). Neither *Kelly* nor Rule 702 requires such a showing as a prerequisite to admission. *Roberson*, 16 S.W.3d at 168; *Griffith*, 976 S.W.2d at 251. Moreover, appellant's complaint centers on the probability-of-paternity statistic because it uses a 0.5 prior probability in the calculation. However, Smuts testified that the formula for calculating the probability of paternity, including the use of 0.5 prior probability, is standard and used by paternity labs throughout the country. She further testified that this calculation of probability of paternity is accepted within the scientific community.[25] From this testimony, the

---

[24] We note that appellant argued at trial that Smuts was not qualified as an expert because she was unable, according to appellant, to clearly articulate the scientific principle and theory underlying the use of Bayes' Theorem and the use of a 0.5 prior probability in the equation for calculating probability of paternity. However, he raises no complaint on appeal about Smuts's lack of qualifications as an expert, but instead now raises this concern in his complaint that the evidence is unreliable.

[25] During questioning of Smuts, the defense suggested that some within the scientific community disagree with using a 0.5 prior probability in calculating the probability of paternity for criminal paternity testing. However, although defense counsel mentioned names and referenced articles and books, he provided no literature reflecting that disagreement to the trial court for consideration.

trial court could have concluded that the techniques applying the theory of DNA paternity testing were valid.

Appellant also suggests that the DNA evidence produced is unreliable because, according to appellant, the lab failed to use an inbreeding co-efficient in the statistical analysis of the DNA results to account for the insular FLDS population. At the 702 hearing, appellant argued that "the population substructure was improperly applied" and that "there was evidence of a more proper population substructure that they didn't apply."[26] Contrary to appellant's contentions, there is no evidence in the record that a different inbreeding co-efficient should have been used or that a different population substructure should have been applied. The record reflects only that there were, at some point, discussions by some lab personnel about the possibility of using a different inbreeding co-efficient, but that no different inbreeding co-efficient was used.[27] The evidence in the record reflects that the statistical analysis was performed in the manner accepted by the scientific community. Smuts repeatedly testified that the use of the FBI database, which incorporates an inbreeding co-efficient, in the statistical analysis is accepted as valid in the scientific community. Nothing in the record reflects that the science or techniques were improperly applied in this case.

There was evidence before the trial court of Smuts's qualifications, experience, and skill to perform the DNA paternity test, the existence of literature supporting the underlying

[26] We will assume, for purposes of this discussion, that appellant's trial complaint about "applying the population substructure" is the same complaint he urges on appeal about the "failure to use an inbreeding co-efficient" in the statistical calculations.

[27] The trial court explicitly stated that she did not hear any evidence about a more appropriate substructure, merely questions about using a different substructure. The record demonstrates that Smuts was not a participant in the lab discussion concerning a different inbreeding co-efficient nor was she involved in making the decision not to change the inbreeding co-efficient.

21

scientific theory and technique, the availability of other experts to test and evaluate the technique, and the clarity with which the underlying scientific theory and technique can be explained to the court. Based on Smuts's testimony, the trial court could conclude by clear and convincing evidence that the scientific theory underlying DNA paternity testing is valid; that the technique applying the theory—including the statistical analysis—is valid; and that the technique was properly applied by the lab analysts in this case. We conclude that the trial did not abuse its discretion in finding that the DNA paternity evidence was reliable.

### *Presumption of Innocence*

In his fifth point of error, appellant challenges the probability-of-paternity statistic calculated from the DNA test results because, he contends, the use of a 0.5 prior probability in calculating the statistic violates the presumption of innocence and shifts the burden of proof.

Under the Due Process Clause of the Fourteenth Amendment, an accused in state court has the right to the "presumption of innocence"—the right to be free from criminal conviction unless the State can prove guilt beyond a reasonable doubt by probative evidence adduced at trial. *Miles v. State*, 204 S.W.3d 822, 825 (Tex. Crim. App. 2006) (citing *Taylor v. Kentucky*, 436 U.S. 478, 483 n.12, 485-86 (1978)); *Madrid v. State*, 595 S.W.2d 106, 110 (Tex. Crim. App. 1979). The Texas Legislature has codified the presumption of innocence in the Texas Penal Code and the Code of Criminal Procedure. *See* Tex. Penal Code Ann. § 2.01 (West 2011); Tex. Code Crim. Proc. Ann. art. 38.03 (West Supp. 2011).

The presumption of innocence is a doctrine that allocates the burden of proof in criminal trials. *Bell v. Wolfish*, 441 U.S. 520, 533 (1979); *Taylor*, 436 U.S. at 485. The phrase is

22

"an inaccurate, shorthand description of the right of the accused to 'remain inactive and secure, until the prosecution has taken up its burden and produced evidence and effected persuasion.'" *Bell*, 441 U.S. at 533 (quoting *Taylor*, 436 U.S. at 483 n.12); *see Miles*, 204 S.W.3d at 825; *see also Black's Law Dictionary* 1306 (9th ed. 2009). "The principal inaccuracy is the fact that it is not technically a 'presumption'—a mandatory inference drawn from a fact in evidence. Instead, it is better characterized as an 'assumption' that is indulged in the absence of contrary evidence."[28] *Taylor*, 436 U.S. at 483 n.12; *see Madrid*, 595 S.W.2d at 110 ("The so-called presumption of innocence is not an inference based on proven fact; rather, it is an assignment of a burden of proof prior to trial based on the substantive law requiring the State to prove guilt beyond a reasonable doubt.").

The presumption of innocence has no correlation with actual innocence. *Zimmerman v. State*, 860 S.W.2d 89, 97 (Tex. Crim. App. 1993) ("the presumption of innocence does not carry with it the connotation that a defendant is in fact innocent"); *Johnson v. State*, 263 S.W.3d 405, 417 (Tex. App.—Waco 2008, pet. ref'd); *Miles v. State*, 154 S.W.3d 679, 683 (Tex. App.—Houston [14th Dist.] 2004) (Hudson, J., concurring), *aff'd*, 204 S.W.3d 822 (Tex. Crim. App. 2006). Rather, the presumption of innocence is merely an expression regarding the State's evidentiary burden and not a suggestion or intimation of the defendant's actual innocence. *See Madrid*, 595 S.W.2d at 110; *Miles*, 154 S.W.3d at 648 (Hudson, J., concurring). The presumption serves as a reminder to the jury

---

[28] Normally, a presumption is a legal inference or assumption that a fact exists, based on the known or proven existence of some other fact or group of facts found. *Black's Law Dictionary* 1304 (9th ed. 2009). A presumption shifts the burden of production or persuasion to the opposing party, who can then attempt to overcome the presumption. *Id.*

23

of the State's burden to prove its case and as an admonishment to consider nothing but the evidence adduced at trial in passing on the defendant's guilt. *Bell*, 441 U.S. at 533; *Miles*, 204 S.W.3d at 825.

Appellant acknowledges that this same challenge has been previously addressed—and rejected—by the Amarillo Court of Appeals. In *Griffith v. State*, 976 S.W.2d 241, 246-50 (Tex. App.—Amarillo 1998, pet. ref'd), the appellant had been convicted of sexually assaulting a mentally retarded female patient at the state school.[29] *Griffith*, 976 S.W.2d at 242. The assault had resulted in pregnancy and birth of a child.[30] *Id.* At trial, the court admitted evidence in the form of paternity test results showing a 99.99 percent probability that Griffith was the father of the child.[31] *Id.* On appeal, Griffith complained that the trial court erred in admitting testimony regarding the DNA testing, specifically the probability-of-paternity statistic based on Bayes' Theorem, which was calculated using a 0.5 prior probability, on the ground that it violated the requisite presumption of innocence in a criminal trial. Concluding that the use of a probability-of-paternity statistic in a criminal proceeding did not violate the presumption of innocence, the *Griffith* court held:

---

[29] In his brief, appellant attempts to distinguish *Griffith*, asserting that the jury in *Griffith* was instructed to disregard the presumption. However, there is no support for this assertion in the *Griffith* opinion. In deciding a separate point of error, wholly unrelated to the admission of the DNA testimony, the court held that an instruction to disregard cured any error related to the State's improper questioning of a witness.

[30] The victim was initially examined because of abdominal swelling, and an x-ray revealed that she was pregnant. She was a profoundly retarded female in her early thirties with an I.Q. of 11. She had the mental capacity of a two-year-old child and, consequently, had greatly diminished communication skills. She was therefore unable to tell anyone that she had been sexually assaulted. Griffith was a direct-care worker on staff at the school.

[31] We note that the DNA paternity tests at issue in *Griffith* analyzed alleles at only six loci. Now, due to advances in DNA testing, the standard is to analyze 13 loci. In this case, the DNA testing included analysis of 15 loci.

> The use of a prior probability of .5 is a neutral assumption. The statistic merely reflects the application of a scientifically accepted mathematical theorem which in turn is an expression of the expert's opinion testimony. It is subject to the same conditions applied to all other testimony. The jury is free to disregard it. It can be weakened on cross and in argument. The statistic does nothing to shift the burden of persuasion or production in a criminal matter.

*Id.* at 247. We agree with the *Griffith* court's evaluation of the probability-of-paternity statistic.

The function of Bayes' Theorem, a conditional probability theory, is to show the effect of a new item of evidence on a previously established probability. In this case the new item was the DNA test results. The previously established probability was the probability of appellant's paternity based on the other non-test evidence without the benefit of the scientific tests. Theoretically, Bayes' Theorem permits a mathematical calculation of the probability of a man's paternity of a child based on all the information known about the child and the man. However, in the scientific lab setting, in arriving at the probability percentage, a DNA analyst is restricted to considering the test evidence only, having no knowledge of the actual facts of the case and no information about the child and the tested man. *See, e.g.*, *Davis v. State*, 476 N.E.2d 127, 138 (Ind. Ct. App. 1985) (rejecting appellants' invitation to require experts to include prior probability based on consideration of circumstantial non-test evidence available concerning appellants' parentage because any expert determination of prior probability based on facts of case would invade function of jury). Therefore, in order to employ the theorem, the lab substituted a neutral probability for the prior-probability variable, i.e., the probability based on non-test evidence. *See id.* (holding that 0.5 probability invoked in Bayes' Theorem was a neutral consideration and probability-of-parentage statistic was admissible). This statistically neutral probability, expressed as a 0.5 prior probability, gives paternity and non-paternity equal weight. As Smuts testified at the 702 hearing, the 0.5 prior

25

probability is a neutral assumption that merely assigns equal statistical probability to the possibility that the tested man is the biological father as to the possibility that he is not the biological father.

Contrary to appellant's contention, the prior probability cannot be zero, as he suggests the presumption of innocence requires. As the *Griffith* court observed:

> [T]he presumption of innocence cannot require us to enter a prior probability of zero into Bayes' Theorem . . . . A zero prior probability does not simply presume a defendant is innocent. Rather, a zero probability, in fact presumes that it was *impossible* for the defendant to be the father. When a zero prior probability is plugged into Bayes' Theorem (the formula), naturally the probability of paternity results becomes 0%. The presumption of innocence does not require a jury to assume it was impossible for a defendant to commit the crime charged. Rather, it requires the jury to assume as a starting proposition that the defendant did not commit the crime, until proven otherwise.

*Griffith*, 976 S.W.2d at 249 (emphasis in original) (footnote omitted); *accord Butcher v. Commonwealth*, 96 S.W.3d 3, 9 (Ky. 2002) (quoting *Griffith*, 976 S.W.2d at 249).

Appellant here, like the appellant in *Griffith*, complains that the 0.5 prior probability destroys the presumption of innocence because it assumes that appellant had intercourse with the victim—a fact that the State must prove.[32] As to the neutrality of the 0.5 prior probability, the *Griffith* court observed, "Logically, the prior probability assumes intercourse *could* have occurred and thus the putative father could be the actual father, but the statistic does not necessarily assume intercourse *did* occur."[33] *Griffith*, 976 S.W.2d at 248 (emphasis in original). By making the prior

---

[32] There was no testimony from Smuts indicating that the prior probability assumes intercourse necessarily occurred or that the use of 0.5 prior probability in any way mandates that assumption.

[33] As the court remarked, the prior assumption could invoke any number of possible conditions or permutations, including time of intercourse, frequency, fertility, access, and other factors. *See Griffith*, 976 S.W.2d at 248.

assumption equally weighted, Bayes' Theorem also allows that intercourse may not have occurred at all. *Id.* The use of a 0.5 prior probability merely acknowledges that intercourse preceded the birth of the child, while positing that there is no greater chance that the alleged father engaged in that intercourse with the mother than that another individual did. *See Butcher*, 96 S.W.3d at 8-9; *Griffith*, 976 S.W.2d at 248. The 0.5 prior-probability assumption says only that it is just as likely that the defendant is the father as any man chosen at random.[34] *See State v. Spann*, 617 A.2d 247, 253 (N.J. 1993). Accordingly, a 0.5 prior-probability assumption assigns no more culpability to appellant than it does to any other random male individual.

Like the appellant in *Griffith*, appellant here relies on several cases from other jurisdictions to support his argument. The courts in *State v. Hartman* and *State v. Skipper* held that paternity test results predicated on a prior-probability assumption were inadmissible because such evidence violates the presumption-of-innocence requirement of criminal proceedings. *State v. Hartman*, 426 N.W.2d 320, 326 (Wis. 1988); *State v. Skipper*, 637 A.2d 1101, 1107-08 (Conn. 1994). In reviewing these decisions, the *Griffith* court found that these holdings were flawed, principally because the underlying rationale assumed—based in large part on a single law review

---

[34] Though it held that the evidence of probability of paternity was inadmissible on other grounds, the New Jersey Supreme Court concluded that the 0.5 prior probability did not assume that intercourse definitely took place. *State v. Spann*, 617 A.2d 247, 253 (N.J. 1993). The court noted:

> Those odds, for instance, are wholly consistent with a fact pattern that one and only one man had access to and intercourse with the victim [as well as] that one of two, and only two, men, including defendant, could possibly have been that one man, neither one more likely than the other to be the father. The fifty-fifty odds calculated into the probability of paternity percentage do not at all assume that defendant had intercourse with the victim; indeed, defendant might have been the one with no access to the victim.

*Id.*

article, Robert W. Peterson, *A Few Things You Should Know About Paternity Tests (But Were Afraid To Ask)*, 22 Santa Clara L. Rev. 667 (1982)—that the probability-of-paternity statistic mandated the assumption that the alleged father had sexual intercourse with the mother. *Griffith*, 976 S.W.2d at 247 (citing *Hartman*, 426 N.W.2d at 326; *Skipper*, 637 A.2d at 1106). The author of the law review article, not a statistician or geneticist but an attorney and professor, concluded that the Bayes' Theorem accurately reflects the odds that the accused is the father only if one assumes that the defendant and a random man both had intercourse with the mother. *Id.* at 248 (citing *Hartman*, 426 N.W.2d at 326). Among other criticisms of the article, the *Griffith* court found that the author failed to cite direct authority, either legal or scientific, to support his statement. *Id.* The court disagreed with the author's basic assumption that the occurrence of intercourse is implicit in the prior-probability value. *Id.*; *accord Spann*, 617 A.2d at 253 ("The conclusion [that intercourse was assumed in the calculation of the probability-of-paternity percentage], however, is incorrect."). Like the *Griffith* court, we disagree with the underlying rationale of these decisions. Just because the value allows for the possibility of intercourse with the alleged father does not mean it mandates the assumption that intercourse occurred. We agree that both *Skipper* and *Hartman* were based on a flawed premise. *See Butcher*, 96 S.W.3d at 8-9; *Griffith*, 976 S.W.2d at 247-49. Accordingly, we do not find support for appellant's contention in those cases.

The record contains testimony from Smuts addressing the reliability of the probability-of-paternity statistic. At the 702 hearing, after testifying about her credentials and expertise in the field of molecular biology as applied to genetic testing, she testified that the methodologies employed in the DNA paternity testing were standard, including the statistical

28

calculations that were used to interpret the test results. Specifically, Smuts testified that use of the 0.5 prior-probability value was standard in DNA paternity testing and that it was a neutral assumption because the alleged father has an equal chance of being the father or not being the father. In light of this testimony, the trial court could reasonably conclude that the Bayes' Theorem calculation, using a 0.5 prior probability, was commonly used in reporting DNA paternity results and that the probability-of-paternity statistic is accepted in the scientific community of molecular biology in reporting paternity results. Based on Smuts's testimony, the trial court acted within its discretion in admitting the probability-of-paternity statistic under the *Kelly* test.[35]

Smuts testified before the jury, based on the neutral 0.5 prior probability, that appellant's probability of paternity was 99.999998 percent. She also testified before the jury that even if the prior probability in the calculation were reduced to 0.1 (10%), reflecting a lower assumption that appellant was the father, the probability of paternity would be 99.99998 percent. She further testified that if the prior probability in the calculation were increased to 0.7 (70%), reflecting a higher assumption that appellant was the father, the probability of paternity of would be 99.9999992 percent.[36] At trial, appellant had ample opportunity to question the use of the

---

[35] We express no opinion about the use of Bayes' Theorem, which requires numerical expression of factual information, in a scientific lab setting. What is significant, however, is that Smuts testified that the probability-of-paternity calculation, based on Bayes' Theorem using a statistically neutral 0.5 prior-probability value that gives paternity and non-paternity equal weight, is standard in the statistical analysis of DNA test results and accepted within the relevant scientific community. Thus, we cannot say that the trial court's decision to admit this evidence was "outside the zone of reasonable disagreement."

[36] Based on the formula to which Smuts testified, it appears that using a prior probability of .0001 in the calculation, as appellant's attorney suggested during his cross-examination of Smuts, would yield a probability of paternity of 99.98%.

prior-probability value and call it to the attention of the jury. Defense counsel questioned Smuts on the use Bayes' Theorem and prior probability and attempted to weaken the effect of the seemingly reliable evidence at issue. We believe the jury was aware that Smuts was expressing her opinion and was free to accept or disregard it. In the case before us, there was non-scientific evidence that appellant had access and opportunity to have intercourse with J. Jessop. The DNA test itself indicated appellant was the true biological father of the child—appellant's DNA profile matched alleles with Z.J.'s DNA profile at all 15 genetic markers. Smuts testified that the statistical calculations, including the probability of paternity, were used as the standard method of reporting paternity tests. As with any other expert testimony, the jury was free to disregard it entirely. Nothing about the 0.5 value shifted the burden of persuasion to appellant.

We agree that "'[t]he 50 percent prior chance assumption does not require shifting the burden of proof to the defendant and is not an impermissible assumption; rather, it is part of a scientific theory and the jury should be so told.'" *Griffith*, 976 S.W.2d at 242 (quoting *Hartman*, 426 N.W.2d at 327 (Steinmertz J., dissenting)). We find no violation of presumption-of-innocence principles in the use of a prior probability to deduce the likelihood of paternity based on DNA test results. *See Griffith*, 976 S.W.2d at 242; *Butcher*, 96 S.W.3d at 10. We conclude that the probability-of-paternity statistic meets the *Kelly* admissibility requirements and that the trial court did not abuse its discretion in admitting such evidence.

Although we conclude that the statistical evidence of probability of paternity was properly admitted, assuming *arguendo* that the statistic was improperly admitted, we conclude that such error was harmless.

The erroneous admission of expert testimony is non-constitutional error. *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). Accordingly, any error must be disregarded unless it affected appellant's substantial rights. *See* Tex. R. App. P. 44.2(b); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Coble*, 330 S.W.3d at 280 (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). If the improperly admitted evidence did not influence the jury or had but a slight effect on its deliberations, such error is harmless. *Id.* (citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)); *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003). In conducting a harm analysis, we examine the entire trial record and calculate, to the extent possible, the probable impact of the error on the rest of the evidence. *Coble*, 330 S.W.3d at 280 (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)). Important factors in considering non-constitutional error are "'the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case.'" *Bagheri*, 119 S.W.3d at 763 (quoting *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002)). In analyzing the erroneous admission of expert testimony, we may consider, among other things: (1) the strength of the evidence of the

31

appellant's guilt;[37] (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or weakness of an expert's conclusions, including whether the expert's opinion was effectively refuted; and (4) whether the State directed the jury's attention to the expert's testimony during arguments. *See Coble*, 330 S.W.3d at 286-88.

In this case, appellant had ample opportunity to cross-examine Smuts on the use of the prior probability. During cross-examination, the defense pointed out to the jury the nature of the probability-of-paternity statistic and how it could perhaps be misleading. The record demonstrated that changing the prior probability affected the probability-of-paternity percentage.[38] More importantly, however, the critical science here was that of the DNA extraction and comparison, not the statistical representation of the DNA test results. The probability-of-paternity statistic merely reinforces the truly condemning evidence of paternity—the DNA test itself. *See Griffith*, 976 S.W.2d at 242 (Quinn, J., concurring). The evidence of extraction and comparison proffered by Smuts, prior to converting the results into any statistics, established that Z.J. could have obtained her DNA only from her mother and appellant (or appellant's identical twin).[39] Here, the test results

---

[37] "Overwhelming evidence of guilt" is a factor to be considered in a harm analysis. *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002); *see Coble v. State*, 330 S.W.3d 253, 286 n.89 (Tex. Crim. App. 2010).

[38] We note that the record reflects that, given the high combined paternity index, changing the prior probability value did not affect the probability of paternity in a statistically significant manner.

[39] Smuts testified that only the biological father or his identical twin would match the child's DNA at every site tested. There was no evidence in the record that appellant has an identical twin. The only evidence regarding an identical twin was the testimony of Smuts who indicated that she was not provided any information about appellant having an identical twin.

32

speak for themselves. Appellant's DNA profile matched Z.J.'s DNA profile at all 15 genetic markers tested. The defense did not question or even object to this DNA evidence.

Moreover, the application or use of Bayes' Theorem relates to only one portion of the DNA evidence. Bayes' Theorem has no effect on the DNA testing itself—that is, developing the genetic profiles from the samples. Nor does Bayes' Theorem affect two of the three statistical representations of the DNA test results: the probability of exclusion and combined paternity index. These other two statistics provide similar and equally compelling information about appellant's paternity of Z.J.[40] The DNA test included appellant—matching him with Z.J.'s DNA at all 15 genetic markers tested—while excluding 99.99997 percent of the male population of his race. The combined paternity index reflected that the observed genetic results are 57,040,000 times more likely if appellant is Z.J.'s true biological father than if an untested randomly selected unrelated male of his race is the father.[41] Further, other non-scientific evidence revealed that appellant had access to J. Jessop, that the two were joined in a spiritual marriage and lived together, purportedly as husband and wife, and that a baby girl named Z.J. was born to "Raymond and [J.] Jessop" in August of 2005. We conclude that the admission of evidence regarding the probability of paternity, even

---

[40] We acknowledge that appellant's objection regarding the population substructure applied, or inbreeding co-efficient used, in the statistical analysis of the DNA test results may affect the combined paternity index and, possibly, the probability of exclusion. However, as previously discussed, the record does not demonstrate that a different inbreeding co-efficient should have been used by the lab, merely that at some point the idea of using a different inbreeding co-efficient was discussed and rejected by lab personnel. Moreover, we believe any dispute about the use of a different inbreeding co-efficient in the statistical analysis affects the weight of the evidence, not its admissibility. *See, e.g.*, *Robinson v. State*, 739 S.W.2d 795, 802 (Tex. Crim. App. 1987) (complaint that evidence not "accurate" goes to weight, not admissibility).

[41] That is, one individual out of 57,040,000 has the same DNA profile as appellant.

if error, did not contribute to appellant's conviction. We overrule appellant's third and fifth points of error.

*Confrontation*

Appellant complains in his fourth point of error that the admission of the DNA testimony violated his right to confrontation because Smuts was unable, according to appellant, to sufficiently explain the reasoning and science behind the mathematical formula for calculating the probability-of-paternity statistic used to express the DNA results.

The Confrontation Clause of the Sixth Amendment provides a right in both federal and state prosecutions to confront and cross-examine adverse witnesses. U.S. Const. amends. VI, XIV; *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Woodall v. State*, 336 S.W.3d 634, 641 (Tex. Crim. App. 2011). The principal concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. *Maryland v. Craig*, 497 U.S. 836, 845 (1990).

To implicate the Confrontation Clause, an out-of-court statement must (1) have been made by a witness absent from trial and (2) be testimonial in nature. *Crawford v. Washington*, 541 U.S. 36, 50-52, 59 (2004); *Woodall*, 336 S.W.3d at 641-62; *King v. State*, 189 S.W.3d 347, 358 (Tex. App.—Fort Worth 2006, no pet.). It is the "literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause." *California v. Green*, 399 U.S. 149, 157 (1970). Thus, *Crawford*'s holding applies only when the extrajudicial testimonial statements of a witness *who does not testify at trial* are sought to be admitted. *See Crawford*, 541 U.S. at 59 (emphasis added). When the declarant appears for cross-examination at trial,

34

the Confrontation Clause places no constraints at all on the use of prior testimonial statements. *Crawford*, 541 U.S. at 59 n.9; *Green*, 399 U.S. at 162; *Woodall*, 336 S.W.3d at 641-62; *see, e.g.*, *Eustis v. State*, 191 S.W.3d 879, 886 (Tex. App.—Houston [14 Dist.] 2006, pet. ref'd); *Hanson v. State*, 180 S.W.3d 726, 731 (Tex. App.—Waco 2005, no pet.); *Crawford v. State*, 139 S.W.3d 462, 465 (Tex. App.—Dallas 2004, pet. ref'd).

Moreover, "'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Woodall*, 336 S.W.3d at 643 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 19 (1985)) (emphasis in original). The "'Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose [forgetfulness, confusion, or evasion] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.'" *Id.* (quoting *Fensterer*, 474 U.S. at 21-22); *see United States v. Kappell*, 418 F.3d 550, 555-56 (6th Cir. 2005) (though two young children were unresponsive or inarticulate at some points during trial testimony, they were subject to cross-examination, and Confrontation Clause guarantees only opportunity for cross-examination).

In this case, Smuts, the DNA forensic analyst, testified at trial and was subject to cross-examination regarding the DNA evidence about which appellant complains. Simply because she did not provide the answers to appellant's satisfaction does not mean appellant was denied the right to confront her. Discerning no violation of appellant's confrontation rights, we overrule appellant's fourth point of error.

35

### III. CHURCH RECORDS

In points of error six through nine, appellant argues that the trial judge erred in admitting documentary evidence seized from the vaults of the temple and temple annex of the YFZ Ranch. Appellant asserts the trial court abused its discretion by admitting this documentary evidence because the evidence was not properly authenticated under Rule 901 of the Texas Rules of Evidence and, further, because such evidence constituted inadmissible hearsay. In addition, he complains that the evidence was irrelevant and inadmissible under Rules 401 and 402 of the Texas Rules of Evidence, inadmissible character conformity evidence under Rule 404(b), and substantially more prejudicial than probative under Rule 403. Appellant further argues that the admission of this documentary evidence violated his right to confront and cross-examine witnesses under both the United States and Texas Constitutions. Finally, appellant asserts that the admission of this evidence violated his right to due process under the United States Constitution and his right to due course of law under the Texas Constitution.

### *Preservation of Error*

Initially, we note that there are multiple preservation issues in connection with appellant's evidentiary complaints. Preservation of error is a systemic requirement on appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009); *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005). A reviewing court should not address the merits of an issue that has not been

preserved for appeal.[42]  *Wilson v. State*, 311 S.W.3d 452, 473-74 (Tex. Crim. App. 2010) (citing *Ford*, 305 S.W.3d at 532).

First, appellant offers no argument or authority with respect to his complaints that the evidence was irrelevant and inadmissible under Rules 401 and 402, impermissible character conformity evidence under Rule 404(b), or substantially more prejudicial than probative under Rule 403.  Nor does he present any argument or authority concerning his contention that the admission of this documentary evidence violated his right to due process under the United States Constitution and his right to due course of law under the Texas Constitution.  Accordingly, we consider these complaints inadequately briefed and as presenting nothing for our review.  *See* Tex. R. App. P. 38.1(i); *Hankins v. State*, 132 S.W.3d 380, 385 (Tex. Crim. App. 2004) (failure to adequately brief issue, either by failing to specifically argue and analyze one's position or provide authorities and record citations, waives any error on appeal); *Aldrich v. State*, 928 S.W.2d 558, 559 n.1 (Tex. Crim. App. 1996); *see also Leza v State*, 351 S.W.3d 344, 358 (Tex. Crim. App. 2011).

---

[42]  Exceptions to this general preservation requirement exist.  For example, the court of criminal appeals has recognized that an appellant may raise for the first time on appeal claims that certain "fundamental" rights were violated.  *See Saldano v. State*, 70 S.W.3d 873, 887 (Tex. Crim. App. 2002) (holding general error preservation requirement does not apply to "two relatively small categories of errors:  violations of 'rights which are waivable only' and denials of 'absolute systemic requirements' . . . [which] may be raised for the first time on appeal") (quoting *Marin v. State*, 851 S.W.2d 275, 279-80 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997)).  In addition, some issues not subject to procedural default, such as evidentiary sufficiency and ineffective assistance of counsel, may be raised for the first time on appeal.  *See Mayer v. State*, 309 S.W.3d 552, 555 (Tex. Crim. App. 2010) (citing *Moff v. State*, 131 S.W.3d 485, 489 (Tex. Crim. App. 2004)); *see also Cannon v. State*, 252 S.W.3d 342, 347 n.6 (Tex. Crim. App. 2008) (citing *Robinson v. State*, 16 S.W.3d 808, 810 (Tex. Crim. App. 2000)).

Second, in his argument concerning the violation of his right to confront and cross-examine witnesses, appellant provides authority only regarding the United States Constitution. Because appellant does not provide separate authority or argument for his state constitutional claim, we do not address it. *See Berry v. State*, 233 S.W.3d 847, 855 n.3 (Tex. Crim. App. 2007); *Heitman v. State*, 815 S.W.2d 681, 690-91 n.23 (Tex. Crim. App. 1991). In addition, because appellant does not argue that the Texas Constitution provides more protection than the United States Constitution, nor explain how it would, we properly resolve this claim under only the United States Constitution. *See Flores v. State*, 319 S.W.3d 697, 702 n.8 (Tex. Crim. App. 2010); *Muniz v. State*, 851 S.W.2d 238, 251 (Tex. Crim. App. 1993).

Third, a review of the record reflects that identical objections were not made to each and every exhibit. Thus, as to some exhibits, some complaints have not been properly preserved for appeal. *See* Tex. R. App. Proc. 33.1(a) (to preserve complaint for appellate review, party must have presented specific and timely request, motion, or objection to trial court and, further, must have obtained adverse ruling); *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011); *Peavey v. State*, 248 S.W.3d 455, 470 (Tex. App.—Austin 2008, pet. ref'd).

Finally, appellant complains globally about the admission of a "large amount of documents," referring to the documents with group labels, but fails to identify any specific exhibit in the record.[43] In his reply brief, appellant acknowledges his failure to identify exhibits, but then

---

[43] The record reflects that 165 exhibits were admitted at the request of the State during both phases of trial. Of those exhibits, 68 are documentary exhibits and 47 appear to be documents recovered from the YFZ Ranch. The remaining documents include certified public records, the curriculum vitae of expert witnesses, the chain of custody forms for the DNA samples, and the lab reports of the DNA analysis.

merely lists in a footnote, without any citations to the record, 46 exhibits included in the "church and family records" of which he complains. An appellant is obligated to point out to the appellate court where the record shows that he has preserved error on his claim.[44] *Davis v. State*, 313 S.W.3d 317, 352 (Tex. Crim. App. 2010); *see Russeau v. State*, 291 S.W.3d 426, 437 (Tex. Crim. App. 2009) (citing Tex. R. App. P. 33.1(a), 38.1(h)). Here, appellant's failure to identify particular exhibits or cite to the record limits our ability to review the trial court's decision to admit particular exhibits, as we do not have the exhibit to examine in connection with the trial objections made and the complaints now raised on appeal. Nevertheless, in the interest of justice, we will address, generally, to the extent possible, appellant's evidentiary complaints.[45]

### Standard of Review

A trial judge has great discretion in the admission of evidence at trial. *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007); *Montgomery*, 810 S.W.2d at 378-79. We review the trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010); *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Under an abuse-of-discretion standard, we do not disturb the trial

---

[44] In fact, the court of criminal appeals recently overruled an appellant's point of error solely because the appellant failed to cite the pages in the record where he made the complained-of argument to the trial court and received a ruling on it. *See Russeau v. State*, 291 S.W.3d 426, 437 (Tex. Crim. App. 2009). The court noted that "[i]t is not our obligation to pore through the voluminous record to verify that appellant preserved his . . . complaint for appellate review." *Id.*

[45] Our review excludes appellant's complaints under Rules 401, 402, 403, and 404(b) of the Texas Rules of Evidence, his confrontation complaint under the Texas Constitution, and his constitutional claims of due process and due course of law violations because these complaints are clearly not preserved for appellate review given appellant's complete failure to proffer any argument or authority in connection with these claims.

court's decision if the ruling was within the zone of reasonable disagreement. *Davis*, 329 S.W.3d at 803; *Bigon v. State*, 252 S.W.3d 360, 367 (Tex. Crim. App. 2008); *see Montgomery*, 810 S.W.2d at 378-79.

### *Authentication*

Within his seventh point of error, appellant complains that the trial judge abused her discretion by admitting the documents recovered from the vaults of the temple and temple annex because they were not adequately authenticated under Rule 901 of the Texas Rules of Evidence. This complaint and the arguments made are identical to those raised and addressed in *Keate v. State*, No. 03-10-00077-CR, 2012 WL 896200, at *7-8 (Tex. App.—Austin Mar. 16, 2012, no pet. h.) (mem. op., not designated for publication). In that opinion, we concluded that the trial court did not abuse its discretion in admitting the complained-of documents as related to appellant's authentication complaint. *See id*. We do not repeat that discussion here. For the reasons stated in our previous opinion in *Keate*, we overrule appellant's seventh point of error as it relates to authentication.

### *Hearsay*

Appellant also asserts in his seventh point of error that the complained-of documents are hearsay and do not fall within one of the hearsay exceptions. Whether hearsay is admissible at a criminal trial is determined by the Texas Rules of Evidence and the Sixth Amendment to the federal Constitution. *Sanchez v. State*, 354 S.W.3d 476, 484 (Tex. Crim. App. 2011).

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). Generally, hearsay statements are not admissible unless the

statement falls within a recognized exception to the hearsay rule. *Pena*, 353 S.W.3d at 814; *see* Tex. R. Evid. 802. Two recognized exceptions, applicable regardless of whether the declarant is available to testify, are records of religious organizations and family records. Texas Rule of Evidence 803(11) excludes from the hearsay rule "[s]tatements of births, marriages, divorces, deaths, legitimacy, ancestry, relationship by blood or marriage, or other similar facts of personal or family history, contained in a regularly kept record of a religious organization." Tex. R. Evid. 803(11). Similarly, Texas Rule of Evidence 803(13) excludes "[s]tatements of fact concerning personal or family history contained in family Bibles, genealogies, charts, engravings on rings, inscriptions on family portraits, engravings on urns, crypts, or tombstones, or the like." Tex. R. Evid. 803(13). The State offered the complained-of documents under these exceptions to the hearsay rule.

In his primary argument against admissibility, appellant maintains that the proffered records were not business records because there was no "regularly conducted business for which the records were created or maintained." He argues that Rebecca Musser[46]—one of the witnesses the State used to authenticate the documents—had no personal knowledge of the records and could not, therefore, establish them as business records because she was unable to testify that the proffered records were created at or near the time of the event, based on personal knowledge or reliable information, and created and maintained in the regular course of the church's business. Because the

---

[46] Rebecca Musser was a former FLDS member and one of the sister-wives of the former "prophet." She testified, based on her personal experience and training as an FLDS member for 26 years, about the process and purpose of maintaining accurate church records, including personal and family records, relating to FLDS members.

complained-of records were not offered under the business records exception, however, such a foundation was not required. *See* Tex. R. Evid. 803(6).

Appellant also argues against admissibility because the exception for records of a religious organization was not meant to include "the writings of an evangelist" but rather "the words of ordinary men and women in the formation of records of the most important of their own personal affairs."[47] He asserts that this exception—based on "the assumption that the records are credible due to the serious nature of religion itself"—should not apply to the FLDS church records. This argument appears to be based on the fact that the church's leader, the "prophet," is "himself a defendant who believes himself to be hearing the voice of God." However, Rule 803(11) does not depend on the personal views or religious beliefs of those making the records. Nor does Rule 803(11) depend on the popularity or acceptance of the religious organization in question or the character of the organization's leader. Hearsay evidence need only be consistent with the provisions of the exception to be admissible. Here, the documents about which appellant complains were various documents relating to marriages, births, family relationships, personal history, and family

---

[47] Appellant offers no argument that the documents were inadmissible under Rule 803(13), the family records exception to the hearsay rule.

history of FLDS members.[48] Further, the evidence at trial demonstrated that these documents were regularly maintained by the FLDS as part of the religious organization of the church.

Where a trial court's decision to admit evidence is within the zone of reasonable disagreement and is correct under any theory of law applicable to the case, the admission will be upheld. *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007). Because the documents about which appellant complains are excepted from the hearsay rule either as records of a religious organization or as family records, or both, the trial court did not abuse its discretion by admitting these documents. We overrule appellant's seventh point of error as it relates to hearsay.

### *Confrontation*

In his sixth point of error, appellant contends that the admission of the complained-of documents violated his constitutional right to confront and cross-examine witnesses under the Confrontation Clause of the Sixth Amendment to the United States Constitution.[49] This point of error and the arguments made are identical to those raised and addressed in *Keate v. State*, 2012 WL 896200, at *9-10. In that opinion, we concluded that the trial court's admission of the

---

[48] For example, documents titled "marriage record" were in fact documents recording the marriage of two individuals, listing the names of the husband, wife, witnesses present, and who performed the ceremony, as well as documenting when and where the ceremony took place. Similarly, documents titled "family group sheet" were family genealogy forms recording the various members of the family: names, dates and places of birth, gender, and family relationship. Documents titled "personal record" were documents describing the personal history of the individual, including the person's name, parents' names, date and place of birth, gender, and the dates and places of significant religious events such as baptism, blessing, and confirmation.

[49] As noted previously, appellant asserted a violation of similar confrontation rights contained in Article 1, § 10 of the Texas Constitution. However, he failed to properly present his complaint with respect to the Texas Constitution, so we do not address it.

complained-of documents did not violate appellant's right to confrontation. *See id.* We do not repeat that discussion here. For the reasons stated in our previous opinion in *Keate*, we overrule appellant's third point of error.

### *Due Process and Due Course of Law*

In his eighth and ninth points of error, appellant asserts that the admission of the complained-of documents violated, generally, his right to due process under the United States Constitution and his right to due course of law under the Texas Constitution. *See* U.S. Const. Amend. XIV, § 1; Tex. Const. Art. 1, § 19. As discussed previously, appellant failed to proffer any argument or authority with respect to these general constitutional claims and therefore waived any error as to these claims due to inadequate briefing. *See* Tex. R. App. P. 38.1(i); *Hankins*, 132 S.W.3d at 385; *Leza*, 351 S.W.3d at 358.

Nevertheless, as discussed above, we have determined that the trial court did not err in admitting the complained-of documentary evidence. Thus, there is no evidentiary error that denied appellant a fundamentally fair trial. We conclude that no violation of due process or due course of law is shown. Appellant's eighth and ninth points of error are overruled.

### IV. MOTION TO QUASH THE INDICTMENT

In points of error ten through thirteen, appellant challenges the trial court's denial of his motion to quash the indictment, which complained of impermissible grand jury procedures in Schleicher County. These four points of error and the arguments made are identical to those raised and addressed in *Jeffs v. State*, 2012 WL 601846, at *11-18. There, we concluded that the trial court

did not abuse its discretion in denying the defendants' joint motion to quash the indictment. *See id.* We do not repeat that discussion here. For the reasons stated in our opinion in *Jeffs*, we overrule appellant's points of error ten through thirteen.

## V. MOTION TO SUPPRESS EVIDENCE

In points of error fourteen through thirty-four, appellant challenges the trial court's denial of his motion to suppress. These twenty-one points of error and the arguments made are identical to those raised and addressed in *Emack v. State*, 354 S.W.3d 828, 833-40 (Tex. App.—Austin 2011, no pet.), and *Jeffs v. State*, 2012 WL 601846, at *4-11. In those opinions, we concluded that the trial court did not abuse its discretion in denying the defendants' joint motion to suppress. *See Emack*, 354 S.W.3d at 833-40; *Jeffs*, 2012 WL 601846, at *4-11. We do not repeat that discussion here. For the reasons stated in our previous opinions in *Emack* and *Jeffs*, we overrule appellant's points of error fourteen through thirty-four.

## VI. PUNISHMENT EVIDENCE

In his final point of error, appellant contends that the trial court erroneously admitted the testimony of three witnesses—Carolyn Jessop, Rebecca Musser, and Dr. Lawrence Beall—during the punishment phase of trial. He argues that the court erred in allowing "irrelevant and prejudicial expert witnesses to testify to victim impact . . . in violation of Rule 702 and *Daubert*."[50] In this

---

[50] In his complaint, appellant references *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). In Texas, for expert testimony based on "hard" science, we employ the *Kelly* test for reliability, which adopted procedural and substantive limitations on the admission of expert scientific testimony consistent with the standards set forth in *Daubert*. *See Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992). However, for evaluating the reliability of expert testimony in fields of study

45

point, appellant urges several legal complaints: relevance of the testimony, prejudicial effect of the testimony, qualifications of these witnesses as experts, reliability of the opinions of these experts, and inadmissibility of victim-impact evidence.[51]

### *Standard of Review*

We review a trial court's decision to admit punishment evidence under an abuse-of-discretion standard. *Davis*, 329 S.W.3d at 802; *Walters*, 247 S.W.3d at 217. We may not disturb a trial court's evidentiary ruling absent an abuse of discretion. *McGhee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007). The trial court abuses its discretion only when its decision lies "outside the zone of reasonable disagreement." *Davis*, 329 S.W.3d at 802; *Walters*, 247 S.W.3d at 217. Moreover, a trial court's evidentiary ruling must be upheld if it is correct under any theory of law that is reasonably supported by the record, even if the trial judge gave the wrong reason for the ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009); *see Gonzalez v. State*, 195 S.W.3d 114, 125-26 (Tex. Crim. App. 2006) (citing *McDuff v. State*, 939 S.W.2d 607, 619 (Tex. Crim. App. 1997); *Romero v. State*, 800 S.W.2d 539, 543-44 (Tex. Crim. App. 1990)).

---

outside the hard sciences—the so-called "soft" sciences—we use the framework set forth by the Texas Court of Criminal Appeals in *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999). *See Coble*, 330 S.W.3d at 274. The *Nenno* test is the applicable test for the complained-of expert testimony in this point of error.

[51] Because appellant bases this single point of error on more than one legal theory, his entire point of error is multifarious. *See* Tex. R. App. P. 38.1; *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). We will, however, in the interest of justice, review the complaints in this point of error that are preserved for appellate review.

### *Carolyn Jessop*

Carolyn Jessop, a former FLDS member who was one of the spiritual wives of appellant's father, testified during the punishment phase of trial about her experiences with appellant, her knowledge of appellant, and his membership in FLDS. She also testified briefly about the organization's polygamous practices—describing plural marriages and the structure of communal living within the polygamous families—and appellant's polygamous relationships. Her testimony was based on her personal acquaintance with appellant as one of his mothers as well as her observations and personal experiences in her 35 years in the FLDS church.

Appellant objected to Carolyn Jessop's testimony on the grounds that the evidence was not directly related to him and was therefore irrelevant under Article 37.07(3)(a)(1) and was substantially more prejudicial than probative under Rule 403. He did not object to her qualifications as an expert or to the reliability of her opinions.[52] To preserve a complaint for appellate review, a party must have presented a specific and timely request, motion, or objection to the trial court and must have obtained an adverse ruling. Tex. R. App. P. 33.1(a); *Pena*, 353 S.W.3d at 807; *Garza v. State*, 126 S.W.3d 79, 81-82 (Tex. Crim. App. 2004); *Peavey*, 248 S.W.3d at 470. Accordingly, the only complaints preserved for appellate review concerning Carolyn Jessop's testimony are appellant's contentions that her testimony was inadmissible under Article 37.07 and Rule 403. For

---

[52] Prior to her testimony, after a proffer about her anticipated testimony, the trial court concluded that Carolyn Jessop was a fact witness, not an expert witness, because her testimony was based on her personal familiarity with appellant, her knowledge of the events of his life, and her observations of him.

the reasons stated in our discussions on relevance and prejudice that follow, we overrule appellant's thirty-fifth point of error as it relates to the testimony of Carolyn Jessop.

### *Rebecca Musser*

Rebecca Musser, another former FLDS member, also testified during the punishment phase. Musser, one of the wives of the former "prophet," was also personally acquainted with appellant. In fact, the evidence reflected that appellant and Musser were cousins. Musser testified generally about the organization's polygamous practices, the training women receive in FLDS regarding relationships between men and women, and the FLDS doctrines and teachings about celestial marriage. She testified about plural marriages, including appellant's plural marriages, the structure of communal living within the polygamous families, and the reassignment of wives and children and how that practice could result in the break-up of families.[53] Musser's testimony was based on her personal knowledge of appellant and her observations and personal experiences in her 26 years in the FLDS church.

Appellant objected to Musser's testimony on the grounds that the evidence was not directly related to him and was therefore irrelevant under Article 37.07(3)(a)(1) and was substantially more prejudicial than probative under Rule 403. He did not object to Musser's qualifications as an expert or to the reliability of her opinions. Because appellant did not object to her testimony on these grounds, his complaints are not preserved for appellate review. *See* Tex. R. App. P. 33.1(a); *Pena*, 353 S.W.3d at 807; *Garza*, 126 S.W.3d at 81-82; *Peavey*, 248 S.W.3d at 470. The only complaints

---

[53] The record demonstrated that Musser was personally acquainted with all nine of appellant's wives and was able to identify them for the jury.

48

preserved for our review concerning Musser's testimony are appellant's contentions that her testimony was inadmissible under Article 37.07 and Rule 403. For the reasons stated in our discussions on relevance and prejudice that follow, we overrule appellant's thirty-fifth point of error as it relates to the testimony of Rebecca Musser.

### *Dr. Lawrence Beall*

During the punishment phase of trial, Lawrence Beall, a clinical psychologist specializing in trauma awareness and treatment, testified about the traumatic effects of sexual assault on children. At the time of trial, Dr. Beall had been a practicing clinical psychologist for 21 years and had been the director for a trauma center in Salt Lake City, Utah, since 1994.[54] As director of the center, he developed protocols for treatment and produced treatment and training manuals.[55] In addition, he authored materials used in professional presentations, as well as an informal paper.[56] Dr. Beall is an expert in psychological trauma, having treated approximately 5,500 victims of trauma—including victims of sexual abuse, cult abuse, and domestic violence—for trauma-related

---

[54] The record reflects that Dr. Beall is also a board certified expert in traumatic stress by the Academy of Trauma Sciences and is a member of the International Society for the Study of Trauma.

[55] Dr. Beall testified that he has written a manual for treating children who have suffered trauma, a manual for helping refugees who have suffered trauma, and a manual of life skills for trauma survivors to help them learn how to acquire such skills, including coping skills often lacking in those who suffer childhood or adolescent trauma. Dr. Beall also testified that he has prepared material for treating traumatized homeless persons and a series of articles published in Iraq for helping children and adults deal with trauma.

[56] Dr. Beall published an informal paper on polygamy, *The Impact of Modern Day Polygamy on Women and Children*, on his website. The paper was, for a time, referenced in a report on the website of the Utah Attorney General. Dr. Beall readily acknowledged that this paper was not a report of a quantitative research study, but rather a statement of his findings as a clinical psychologist treating people who had left polygamous communities.

49

disorders. His practice also included treatment of adults and children who had been members of

some of the polygamous communities of FLDS as well as other polygamous communities. The

evidence also reflected that Dr. Beall was familiar with FLDS theology and had interviewed several

FLDS women members in preparation for his testimony.

Dr. Beall testified about several areas of concern related to the sexual assault of

children: trauma caused to girls generally by underage sexual assault; how adolescent psychological

development is affected by underage sexual assault and placement in underage marriages; how

adolescent psychological development affects the ability to give consent in connection with underage

marriage and underage sexual activity; conditioning or grooming practices associated with the sexual

assault of children; and the impact on girls and women of living in a polygamous community. His

testimony included an explanation of how the indoctrination of children within FLDS allowed for

the perpetration of crimes against children. Basically, he indicated that the indoctrination practices,

based on the doctrines and teachings of FLDS, allowed members to become compliant with and

complicit in underage marriages, sexual activity with underage children, and polygamous marriages.

Just before Dr. Beall testified, appellant filed written objections to his testimony.[57]

Although these written objections contained numerous objections,[58] appellant raises only five

---

[57] Several days prior to Dr. Beall's testimony, the trial court conducted a hearing outside the presence of the jury pursuant to Rule 702. No actual objections were made at the 702 hearing. The court of criminal appeals has held that the 702 or *Daubert* hearing alone does not preserve a complaint for appellate review. *See Davis v. State*, 313 S.W.3d 317, 352-53 (Tex. Crim. App. 2010) (defendant must still lodge objection at *Daubert* hearing to preserve error); *Neal v. State*, 256 S.W.3d 264, 279 (Tex. Crim. App. 2008) (failure to articulate objection after *Daubert* hearing forfeited right to challenge expert's qualifications on appeal).

[58] In his written objections, appellant first asserted that Dr. Beall's opinions were unfounded in science and that he was not qualified to offer such opinions. He further argued that the admission

50

complaints on appeal related to his trial objections: the reliability of Dr. Beall's expert opinions, his qualifications as an expert, the relevance of his testimony under Article 37.07, the substantially prejudicial effect of his testimony under Rule 403, and improper victim-impact evidence.

### *Expert Testimony*

Before admitting expert testimony under evidence rule 702, the trial court should determine that the expert is qualified, the opinion is reliable, and the evidence is relevant. *See* Tex. R. Evid. 702; *Vela*, 209 S.W.3d at 131; *see also Jackson*, 17 S.W.3d at 670. These three requirements—qualification, reliability, and relevance—raise distinct questions and issues. *Shaw v. State*, 329 S.W.3d 645, 655 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *see Vela*, 209 S.W.3d at 131. Accordingly, a party may challenge expert testimony on at least three specific grounds. First, a party may allege that the witness does not qualify as an expert because he lacks the requisite knowledge, skill, experience, training, or education in the subject matter of his testimony. *Vela*, 209 S.W.3d at 131; *see* Tex. R. Evid. 702. Second, a party may allege that the subject matter of the testimony is inappropriate because it is unreliable. *Vela*, 209 S.W.3d at 131, 133-34; *see* Tex. R. Evid. 705(c); *Kelly*, 824 S.W.2d at 573. Third, a party may allege that the testimony will not assist the fact finder in deciding the case. *Vela*, 209 S.W.3d at 131; *see* Tex. R. Evid. 401, 702.

---

of Dr. Beall's testimony would violate appellant's rights to due process under the United States Constitution, due course of law under the Texas Constitution, equal protection under the Texas Constitution, effective assistance of counsel under the United States and Texas Constitutions, and confrontation under the United States and Texas Constitutions. In addition, appellant asserted that th State should not be allowed to offer or allude to Dr. Beall's opinions under Rules 401, 402, 403, 702, 703, and 705 of the Texas Rules of Evidence and Article 37.07 of the Texas Code of Criminal Procedure. Finally, appellant argued that Dr. Beall's testimony should be excluded because it constituted improper victim-impact evidence.

We review a trial court's ruling on the admissibility of expert testimony for an abuse of discretion. *Layton*, 280 S.W.3d at 240; *Weatherred*, 15 S.W.3d at 542. As with other types of evidentiary rulings, we will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Layton*, 280 S.W.3d at 240 (citing *Montgomery*, 810 S.W.2d at 380). Such rulings will rarely be disturbed by an appellate court. *Vela*, 209 S.W.3d at 136; *Rodgers*, 205 S.W.3d at 528-29 n.9. Before reversing the trial court's decision, we must find the trial court's ruling was so clearly wrong as to lie outside the realm within which reasonable people might disagree. *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *Green v. State*, 191 S.W.3d 888, 895 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). Absent a clear abuse of that discretion, the trial court's decision to admit or exclude expert testimony will not be disturbed. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000).

### *Dr. Beall's Qualifications*

Rule 702 of the Texas Rules of Evidence allows a witness qualified by knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would assist the trier of fact in understanding or determining a fact issue. Tex. R. Evid. 702. A person's specialized education, practical experience, study of technical works, or some combination thereof may provide him with the specialized knowledge that qualifies him to testify as an expert. *Wyatt*, 23 S.W.3d at 27; *Turner v. State*, 252 S.W.3d 571, 585 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). The qualifications of an expert witness are distinct from the reliability and relevance of the opinion testimony and, therefore, should be evaluated independently. *Vela*,

52

209 S.W.3d at 131; *Bryant v. State*, 340 S.W.3d 1, 7 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *see Escamilla v. State*, 334 S.W.3d 263, 268 (Tex. App.—San Antonio 2010, pet. ref'd).

The evaluation of an expert's qualifications entails a two-step inquiry: first, whether the witness possesses sufficient background in a particular field, and second, whether that background goes to the matter on which the witness is to give an opinion. *Davis*, 329 S.W.3d at 813; *Vela*, 209 S.W.3d at 131 (citing *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)). The focus is on the fit between the subject matter at issue and the expert's familiarity with it. *Davis*, 329 S.W.3d at 813; *Vela*, 209 S.W.3d at 133. Because the spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses appropriate qualifications as an expert on a specific topic in a particular case. *Davis*, 329 S.W.3d at 813; *Vela*, 209 S.W.3d at 136. To be qualified to give expert opinion testimony, the witness "must possess some additional knowledge or expertise beyond that possessed by the average person, but the gap need not necessarily be monumental." *Davis*, 313 S.W.3d at 350. A trial court's determination of the qualifications of a witness to testify as an expert is afforded great deference. *Id*. at 350-51; *Rodgers*, 205 S.W.3d at 527-28.

Dr. Beall, the director of a trauma center in Salt Lake City, Utah, was trained as a clinical psychologist with specialization in psychological trauma, which included sexual assault, domestic violence, war trauma, refugee trauma, gang violence, and cult abuse. He obtained a Ph.D. from Brigham Young University and spent 21 years treating the victims of trauma—approximately 5,500 patients, including adults and children within the FLDS community and other polygamous communities. In preparation for his testimony, he reviewed numerous documents removed from the

53

YFZ Ranch and interviewed several FLDS members. Dr. Beall testified that throughout his career he has read information about cults and polygamous groups. In addition, he demonstrated a familiarity with the theology and practices of FLDS, along with the mainstream Mormon church.[59] Finally, Dr. Beal testified that he has appeared as an expert in court on at least thirty prior occasions in the area of clinical psychology.

Dr. Beall has a degree in a field of study involving human behavior and specialized experience in behaviors associated with the victimization of children by sexual abuse, underage marriage, and plural marriage. The record shows that Dr. Beall was qualified by education, training, and experience in the field of psychology and psychological trauma. His opinions were based on general psychological principles as well as his specialized experience. He was qualified to opine about the impact of sexual assault, underage marriage, and polygamy on children. We hold that the trial court did not abuse its discretion in overruling appellant's objection to Dr. Beall's qualifications as an expert. Appellant's thirty-fifth point of error is overruled as it relates to the violation of Rule 702.

### *Reliability of Dr. Beall's Opinions*

While qualification deals with the witness's background and experience, reliability focuses on the subject matter of the witness's testimony. *Vela*, 209 S.W.3d at 131. The proponent of the expert testimony must demonstrate by clear and convincing evidence that the expert testimony is reliable. *Russeau*, 171 S.W.3d at 881. The focus of the reliability analysis is to determine whether

---

[59] The evidence showed that Dr. Beall is a practicing member of the Mormon church.

the evidence has its basis in sound scientific methodology such that testimony about "junk science" is weeded out. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996). When addressing fields of study aside from the hard sciences, such as the social sciences or fields that are based primarily on experience and training as opposed to the scientific method, the requirement of reliability still applies, but with less rigor than to the hard sciences. *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999); *Perez v. State*, 113 S.W.3d 819, 833 (Tex. App.—Austin 2003, pet. ref'd), *overruled on other grounds by Taylor v. State*, 268 S.W.3d 571 (Tex. Crim. App. 2008).

Expert testimony in the field of psychology is a "soft science." *See Tillman*, 354 S.W.3d at 435; *Perez*, 113 S.W.3d at 833-34. Consequently, to establish its reliability, the proponent must establish that: (1) the field of expertise involved is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies on or utilizes the principles involved in that field. *Tillman*, 354 S.W.3d at 435-36 (citing *Nenno*, 970 S.W.2d at 561); *Davis*, 329 S.W.3d at 814-15. This analysis is "'merely an appropriately tailored translation of the *Kelly* test to areas outside of hard science.'"[60] *Tillman*,

---

[60] In *Kelly v. State*, the court of criminal appeals outlined several factors that could affect a trial court's determination of reliability, including but not limited to: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the experts testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573.

354 S.W.3d at 435-36 (quoting *Nenno*, 970 S.W.2d at 561). The general principles announced in *Kelly* apply, but the specific factors outlined may or may not apply depending on the context. *Coble*, 330 S.W.3d at 273 (citing *Nenno*, 970 S.W.2d at 560). The methods of proving reliability in the soft sciences will vary, depending on the field of expertise. *Nenno*, 970 S.W.2d at 561; *Perez*, 113 S.W.3d at 833-34.

Psychology is a legitimate field of study. *See Tillman*, 354 S.W.3d at 436; *Perez*, 113 S.W.3d at 833-34. We believe adolescent psychological development—including how it affects the ability to give consent and how sexual abuse impacts it—is a legitimate subject within the field of psychology. We further believe that the concept of indoctrination, including its affect on adolescent psychological development, is a legitimate subject within the field of psychology. In addition, the impact of sexual abuse is a legitimate subject well established in the field of psychology.[61] *See Perez*, 113 S.W.3d at 832. Further, conditioning or grooming practices associated with the sexual assault of children is a legitimate filed of study. *See Morris v. State*, No. PD–0796–10, 2011 WL 6057840, at *5 (Tex. Crim. App. Dec. 7, 2011).

All of the opinions offered by Dr. Beall were within the scope of the field of psychology. As we noted previously, his opinions were founded on general psychological principles and his specialized experience. Due to Dr. Beall's superior knowledge and experience concerning

---

[61] Courts have repeatedly upheld the admission of expert testimony concerning behavioral characteristics exhibited by children that have been empirically shown to be common among children who have been abused. *See Cohn v. State*, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993); *Yount v. State*, 872 S.W.2d 706, 709 (Tex. Crim. App. 1993); *DeLeon v. State*, 322 S.W.3d 375, 382-83 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *Reyes v State*, 274 S.W.3d 724, 729 (Tex. App.—San Antonio 2008, pet. ref'd); *Perez v. State*, 113 S.W.3d 819, 832 (Tex. App.—Austin 2003, pet. ref'd), *overruled on other grounds by Taylor v. State*, 268 S.W.3d 571 (Tex. Crim. App. 2008).

adolescent psychological development, child sexual abuse, psychological trauma, and polygamous communities, the opinions he offered were within the scope of his expertise. Appellant fails to identify "principles involved in the field" of psychology that Dr. Beall's testimony failed to rely on or utilize. From his testimony, it is clear that Dr. Beall was applying the general principles of psychology, including those related to adolescent psychological development and the effects of trauma and abuse, to the particular setting of polygamous communities.

Thus, the evidence shows that Dr. Beall's expert testimony was reliable under *Nenno*. Accordingly, the trial court did not abuse its discretion in admitting Dr. Beall's expert testimony over appellant's reliability objection. Appellant's thirty-fifth point of error is overruled as it relates to the violation of Rule 705.

### *Relevance of Testimony and Article 37.07*

Appellant characterizes the testimony of Carolyn Jessop, Rebecca Musser, and Dr. Beall as inadmissible "victim impact" evidence.[62] He argues against its admissibility and relevance under Article 37.07(3)(a)(1) of the Texas Code of Criminal Procedure on the ground that the evidence is not directly linked to him. However, a review of the testimony of these three witnesses reveals that the evidence is more appropriately characterized as character evidence. More specifically, the testimony of these witnesses constituted evidence showing the beliefs and character of appellant as demonstrated by his association with FLDS. We do not construe the

---

[62] The State did not dispute this characterization at trial, although some of the State's responses to appellant's objections at trial indicated that the evidence was offered to prove up specific bad acts committed by appellant as well as to demonstrate appellant's character.

57

complained-of evidence to be evidence of victim impact at all, but rather evidence of appellant's character. It is analogous to gang-membership evidence in that it demonstrates appellant's beliefs and character through his participation and membership in an organization that, per doctrine and practice, engages in activities that constitute crimes against children.

Section 3(a) of article 37.07 of the Texas Code of Criminal Procedure governs the admissibility of evidence at the punishment phase of a non-capital criminal trial and grants the trial court broad discretion to admit evidence that the court deems relevant to sentencing. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (West Supp. 2011); *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008). Admissibility of evidence at the punishment phase of a trial of a non-capital felony offense is a function of policy rather than relevancy. *Hayden v. State*, 296 S.W.3d 549, 552 (Tex. Crim. App. 2009); *Come v. State*, 82 S.W.3d 486, 491 (Tex. App.—Austin 2002, no pet.). In ascertaining what is relevant to sentencing, the focus is on what is helpful to a jury in deciding an appropriate sentence for a defendant. *Sims*, 273 S.W.3d at 295; *McGhee*, 233 S.W.3d at 318; *Come*, 82 S.W.3d at 491. Giving complete information about the defendant so the jury can tailor an appropriate sentence is one of the policy reasons to be considered when determining whether to admit punishment evidence. *Erazo v. State*, 144 S.W.3d 487, 491 (Tex. Crim. App. 2004) (citing *Mendiola v. State*, 21 S.W.3d 282, 285 (Tex. Crim. App. 2000)).

Evidence concerning one's beliefs and associations may be admissible if shown to be relevant. *Davis*, 329 S.W.3d at 805; *Mason v. State*, 905 S.W.2d 570, 576 (Tex. Crim. App. 1995) (citing *Dawson v. Delaware*, 503 U.S. 159, 161 (1992)); *Shelton v. State*, 41 S.W.3d 208, 214 (Tex. App.—Austin 2001, pet. ref'd). The court of criminal appeals has recognized that when the

defendant is charged with an act of violence, membership in an organization with a reputation for violent activities is relevant evidence because it relates to his character. *Beasley v. State*, 902 S.W.2d 452, 456 (Tex. Crim. App. 1995); *Anderson v. State*, 901 S.W.2d 946, 950 (Tex. Crim. App. 1995). Therefore, evidence of a defendant's gang membership may be relevant and admissible at the punishment stage of a trial to show the character of the accused. *Jones v. State*, 944 S.W.2d 642, 652-53 (Tex. Crim. App. 1996); *Beasley*, 902 S.W.2d at 456. This is because evidence of gang membership allows the jury to make an informed decision regarding the character of the defendant when determining the appropriate punishment to assess. *See Anderson*, 901 S.W.2d at 950.

We believe the principles allowing for the admission of evidence of gang membership are, in general, applicable here. If the defendant's membership in an organization and the organization's nature and activities give the jury valuable information regarding the character of the defendant, such information should be allowed into evidence. *See Thompson v. State*, 33 S.W.3d 847, 853 (Tex. App.—Tyler 2000, no pet.) (holding that trial court did not abuse its discretion in admitting evidence of appellant's membership in Republic of Texas and reputation of that organization). The jury is concerned at the punishment phase with evaluating a defendant's background and character. A person's beliefs and associations reflect his background and character. Thus, evidence of a defendant's membership in an organization and that organization's activities is admissible because it is relevant to the issue of the defendant's character. As Judge Mansfield noted in his concurring opinion in *Anderson*, "evidence of an individual's membership in the Boy Scouts, Rotary Club, or the Shriners is admissible at the punishment stage as evidence of good character.

59

A plain reading of Article 37.07 leads to the conclusion that membership in organizations dedicated primarily to illegal aims . . . is admissible at punishment as evidence of bad character." *Anderson*, 901 S.W.2d at 952 (Mansfield, J., concurring). Here, where appellant was charged with a sexual crime against a child, membership in an organization that routinely engages in activities that result in sexual crimes against children is relevant evidence because it relates to appellant's character.

In order to prove the relevance of a defendant's membership in an organization or group, the State must show proof of (1) the group's violent and illegal activities and (2) the defendant's membership in the organization. *Davis*, 329 S.W.3d at 805; *Mason*, 905 S.W.2d at 577; *Shelton*, 41 S.W.3d at 214. Once evidence of group membership is established, the prosecution must then present to the jury evidence of the activities of the group generally. *See Beasley*, 902 S.W.2d at 456; *Anderson*, 901 S.W.2d at 950 ("Although relevant, gang membership alone would be meaningless to a jury which has no knowledge of the gang's purpose or activities."). "It is essential for the jury to know the types of activities the [group] generally engages in so that they can determine if [the defendant's group] membership is a positive or negative aspect of his character, and subsequently his character as a whole." *Beasley*, 902 S.W.2d at 456. It is not necessary to link the accused to the bad acts or misconduct generally engaged in by group members, so long as the jury is (1) provided with evidence of the defendant's group membership, (2) provided with evidence of the character and reputation of the group, (3) not required to determine if the defendant committed the bad acts or misconduct, and (4) only asked to consider reputation or character of the accused. *See id.* at 457.

In the instant case, the State presented evidence of both group membership and the group's activities. The undisputed evidence, including church records reflecting his prominent position within the organization[63] and the testimony of Musser and Carolyn Jessop, showed that appellant was a member of FLDS. The complained-of testimony of Musser, Carolyn Jessop, and Dr. Beall provided evidence of the illegal activities of FLDS. From their testimony, the jury learned that the doctrine and practices of FLDS promote underage and plural marriages that result in the sexual assault of children and the commission of bigamy. Musser and Carolyn Jessop testified about the underage marriages, polygamous practices, reassignment of wives, and sexual activity with underage children. Dr. Beall provided information of the harmful impact of underage marriages, polygamous marriages, and sexual assault on children, demonstrating the injurious nature of the organization's activities.

We conclude that appellant's membership in an organization that promotes and practices polygamy and underage marriages that result in the sexual assault of children is relevant to the question of appellant's character for purposes of punishment. Accordingly, the trial court did not abuse its discretion in allowing Rebecca Musser, Carolyn Jessop, and Dr. Beall to testify during the punishment phase. Appellant's thirty-fifth point of error is overruled as it relates to relevance and the violation of Article 37.07.

---

[63] The evidence reflected that appellant had achieved the priesthood position of "elder" within the church and was also "counselor to the bishop" for the YFZ Ranch (his father)—a position of prestige and authority.

*Prejudice and Rule 403*

Having determined that evidence of the appellant's membership in FLDS was relevant, we must next weigh its probative value against its prejudicial effect. Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Davis*, 329 S.W.3d at 806; *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997). "The term 'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Davis*, 329 S.W.3d at 806 (citing *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007)). "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* All testimony and physical evidence are likely to be prejudicial to one party or the other. *Davis*, 329 S.W.3d at 806; *Jones*, 944 S.W.2d at 653. It is only when there exists a clear disparity between the degree of prejudice produced by the offered evidence and its probative value that Rule 403 is applicable. *Davis*, 329 S.W.3d at 806; *Williams*, 958 S.W.2d at 196.

Evidence of appellant's FLDS membership was obviously unfavorable to appellant, but we conclude it was not unfairly prejudicial. It came as part of a larger examination of his character, behavior, and beliefs—which included the endorsement of and participation in the FLDS practice of underage marriage that subjected children to sexual assault. In this case, the jury received evidence that appellant personally engaged in the practice of plural marriages and underage

62

marriage—two of his nine wives were underage—as well as the reassignment of wives and children. The evidence revealed that on the day he married J. Jessop, appellant also married two other young women—all within ten minutes. All three wives and their children had been reassigned to him from another FLDS member, his brother. The evidence demonstrated that appellant's activities reflected his faithful adherence to the doctrines and practices of the FLDS church, including those that lead to the perpetration of criminal offenses.

All of this evidence, taken together, revealed a man whose life was centered around a belief system that, in practice, regularly and routinely involved activities that resulted in crimes against children. The evidence of appellant's FLDS membership was but one of the factors that allowed the jury to rationally gauge the probability that appellant would commit a similar sexual assault or be complicit in the sexual assault of other children. This evidence was not so unfairly prejudicial that there was a clear disparity between the degree of the prejudice and its probative value. The trial court therefore did not abuse its discretion in admitting this evidence. Appellant's thirty-fifth point of error is overruled as it relates to the violation of Rule 403.

## CONCLUSION

Having found that the evidence is sufficient to prove both penetration and territorial jurisdiction, we hold the evidence is sufficient to support appellant's conviction for sexual assault of a child. In addition, we hold that the trial court did not abuse its discretion in admitting the DNA paternity evidence, the church and family records recovered from the YFZ Ranch, or the testimony of Carolyn Jessop, Rebecca Musser, and Dr. Lawrence Beall during the punishment phase of trial.

63

We further hold that the trial court did not abuse its discretion in denying appellant's motion to quash the indictment and motion to suppress evidence.

The judgment of conviction is affirmed.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed: April 19, 2012