# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00181-CR

**Bobby Ray Burks, Jr., Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT
### NO. 10-691-K277, THE HONORABLE BERT RICHARDSON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant, Bobby Ray Burks, Jr., was convicted of capital murder and sentenced to life in prison without the possibility of parole.[1]  *See* Tex. Penal Code §§ 12.31(a), 19.03(a)(2).  In four points of error, appellant claims that the trial court erred in denying his *Batson* challenge, that the evidence is insufficient to corroborate accomplice-witness testimony, and that the trial court erred in admitting expert testimony and evidence of certain items collected from his car.  Finding no reversible error, we affirm the trial court's judgment of conviction.

---

[1]  The State sought the death penalty, but the jury answered the capital special issues submitted in the punishment charge in such a manner as to result in the imposition of a life-without-parole sentence.  *See* Tex. Code Crim. Proc. art. 37.071, § 2(b).

# BACKGROUND

Appellant is the brother-in-law of Veronica Ortiz and Isabel Gonzales. Pursuant to a plan formulated by appellant, Ortiz and Gonzales lured 23-year-old Jorge Castaneda and his 18-year-old cousin Raul Torres, unsuspecting patrons of an Austin nightclub, from the parking lot of the club to a predetermined location on an isolated rural road so appellant could ambush and rob them. The women pretended to need a ride home and, upon entering Castaneda's vehicle, directed him toward the predetermined spot where appellant waited. While en route, the women and appellant texted back and forth. When the women saw appellant's car, one of them feigned being ill. Castaneda pulled over to the side of the road to accommodate her needs. Just before he pulled over, he noticed a blue Mustang parked off the side of the road. When Castaneda stopped, both women got out of his vehicle and he lost sight of them.

Immediately after the women ran off, appellant appeared at the open back passenger door with a gun in his hand. He pointed it at Torres and Castaneda and in a "loud, coarse voice" demanded their money several times. Torres, seated in the back seat, gave appellant his wallet. After removing some, but not all, of the money from his wallet, Castaneda turned, reached back, and handed appellant the money. When Castaneda turned back toward the front, appellant shot Torres in the head. Hearing the shot, Castaneda immediately drove off. As he did so, a second shot passed by his head and shattered the window of the driver's door. In a panic, Castaneda called his uncle as he attempted to drive back to town. When he heard that Torres had been shot, the uncle told Castaneda to drive Torres to a nearby hospital and provided directions to him. Torres died on the way before reaching medical care.

## DISCUSSION

### *Batson* Challenge

In his first point of error, appellant asserts that the trial court erred in denying his *Batson* challenge because the State used one of its peremptory strikes on panel member number 25 because of her race, in violation of the right to equal protection under the law.[2]

The State violates the Equal Protection Clause of the U.S. Constitution when it exercises a peremptory strike to exclude a venire-panel member based solely on race. *Batson v. Kentucky*, 476 U.S. 79, 86 (1986); *see* U.S. Const. amend. XIV, § 1; Tex. Code Crim. Proc. art. 35.261(a); *see also Powers v. Ohio*, 499 U.S. 400 (1991) (eliminating requirement that defendant and panel member struck must be same race). A challenge to the State's use of a peremptory strike under *Batson* has three steps. First, a prima facie case of discrimination must be established by the opponent of the strike.[3] *Nieto v. State*, 365 S.W.3d 673, 675–76 (Tex. Crim. App. 2012). Second, the State must produce a facially non-discriminatory reason for its use of the strike. *Id.* at 675; *see Purkett v. Elem*, 514 U.S. 765, 768 (1995) ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."). Third, the opponent of the strike must show purposeful discrimination by the State. *Nieto*, 365 S.W.3d at 675. Whether the opponent has satisfied his burden of persuasion to show that the State's facially race-neutral explanation for the strike is not genuine but instead pretextual is a question of fact for the trial court

---

[2] For privacy reasons, we refer to the relevant panel members by number rather than by name. The record reflects that panel member number 25 was African-American.

[3] If the State does not challenge the prima-facie-case step, the appellate court will not review whether an appellant established a prima facie case. *Wheatfall v. State*, 882 S.W.2d 829, 835 (Tex. Crim. App. 1994).

to resolve. *Blackman v. State*, 414 S.W.3d 757, 765 (Tex. Crim. App. 2013). We review the entire record from voir dire and are not limited to the specific arguments made to the trial court by the parties. *Nieto*, 365 S.W.3d at 675–76; *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008). We examine the trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous. *Blackman*, 414 S.W.3d at 765; *Watkins*, 245 S.W.3d at 448; *see Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (trial court's ruling in third step must be sustained unless it is clearly erroneous).

Appellant argues that he has shown intentional discrimination via a comparative juror analysis because the answers given by panel member number 25 were similar to answers given by juror number 2, a Hispanic juror who was not struck by the State.[4] Courts identify disparate treatment of veniremembers, which exists when the State's explanations for eliminating members of a particular racial group apply equally well to members of another race who were not eliminated, using a side-by-side comparison, or "comparative analysis," of veniremembers of a particular race who were struck and members of other races who were not struck. *See Miller-El v. Dretke*, 545 U.S. 231, 232 (2005); *Watkins*, 245 S.W.3d at 448–49. If the reasons asserted by the State for eliminating a minority panel member apply equally well to non-minority members who were not struck, there is some evidence tending to show disparate treatment and consequently intentional discrimination based on race. *See Miller-El*, 545 U.S. at 232. However, if the answers of the

---

[4] We note that in his brief, appellant identifies juror number 2 as a white panel member. However, the record reflects that in response to appellant's counsel's questioning during voir dire, she identified herself as a "Hispanic woman."

4

minority panel members are materially distinguishable from those selected to serve, then no disparate treatment or intentional discrimination is shown. *Cf. Adanandus v. State*, 866 S.W.2d 210, 225 (Tex. Crim. App. 1993) (when State offers numerous race-neutral reasons for peremptory challenge, "we cannot say that the fact that there were other acceptable jurors possessing one or more of these objectionable attributes, is sufficient to establish disparate treatment").

At trial the prosecutor explained that the State struck panel member number 25 for multiple reasons, including: (1) her general opposition to the death penalty, (2) her demeanor, (3) the criminal history of a family member, (4) her recent arrest, (5) her prior employment, and (6) her familiarity with defense counsel. Appellant contends the State's proffered reasons were merely pretextual. He argues that because some of panel member number 25's answers were similar to those of juror number 2, who was accepted by the State, he has proved intentional discrimination. We disagree.

The juror questionnaire in this case contained a series of statements the panel members were asked to agree or disagree with.[5] While it is true that both panel member number 25 and juror number 2 endorsed some of the same statements, the record reflects that panel member number 25 endorsed statements reflecting a stronger opposition to the death penalty and, further, that her questionnaire responses were internally inconsistent while juror number 2's were not.[6]

---

[5] Although the parties referred to juror questionnaires during the discussion of the *Batson* challenge, no such questionnaires are included in the record presented to this Court. It was incumbent upon appellant to request that the juror questionnaires be included in the record. *See Vargas v. State*, 838 S.W.2d 552, 556–57 (Tex. Crim. App. 1992).

[6] For example, the attorneys' discussion of the questionnaires reflects that both women agreed with the following statements:

The State also offered a demeanor-based reason for exercising a peremptory challenge on panel member number 25, indicating that "throughout her questioning, [panel member number 25] had sort of a look of bewilderment and look of confusion," and noting her hesitancy to answer questions and that she "kind of vacillated on her questionnaire." *See Nieto*, 365 S.W.3d at 680 (demeanor of potential juror is valid reason to exercise peremptory strike) (citing *Yarborough v. State*, 947 S.W.2d 892, 896 (Tex. Crim. App. 1997)). The prosecutor also stated that she was "bothered" by panel member number 25's "flippant answers." In contrast, the State noted that juror number 2 "consistently gave us very clear, very confident, very . . . reasonable answers." In comparing the two jurors, the prosecutor explained that juror number 2 "seemed to be very open-minded and intelligent and grasped the issues very well in comparison to [panel member number 25] [who], like I said, just seemed just a little baffled by everything." Appellant argues that the State's characterization of panel member number 25 and her demeanor were contradicted by the defense counsel's observations and objections and the record. However, after noting that he

---

- I do not believe in capital punishment, but it may be necessary.
- I do not believe in capital punishment, but it's not practically advisable to abolish it.
- I think capital punishment is necessary, but I wish it were not.

However, panel member number 25 also endorsed the following statements, some of them contradictory:

- Capital punishment may be wrong, but it's the best preventative to crime.
- Capital punishment has never been effective in preventing crime.
- Capital punishment cannot be regarded as a sane method for dealing with crime.
- Life imprisonment is more effective than capital punishment.
- Capital punishment is wrong, but it's necessary in our imperfect civilization.
- Execution of criminals is a disgrace to civilized society.
- The State cannot teach the sacredness of human life by destroying it.

observed the questioning of both panel members, the trial court explicitly found them to be "very distinct." We defer to the trial court's ruling, particularly when the question turns on credibility and demeanor, because it is in the best position to make determinations of credibility and evaluations of demeanor. *See Nieto*, 365 S.W.3d at 676.

The record does reflect that both panel members had family members with a criminal history. However, the record also reflects a clear distinction in the women's responses to questions concerning that topic. Panel member number 25 did not know the exact nature of her nephew's prior conviction, nor did she indicate how or whether his experience impacted her. In contrast, juror number 2 expressed familiarity with her family members' criminal offenses and clearly articulated how their experiences influenced her, expressing that "accountability is very important to [her]."

In addition, the State noted that panel member number 25 herself had a recent arrest for DWI. Although that case was ultimately dismissed, her responses indicated that she was arrested by an officer from the Austin Police Department, and the State argued that she "showed some sort of attitude about the Austin Police Department" which caused concern to the State since some of the State's witnesses were employed by that agency. Juror number 2 had no recent arrests, no personal criminal history, and no contact with a law-enforcement agency involved in this case.

The State also expressed concerns about panel member number 25's prior employment with the Travis County court system due to the "liberal leanings of Travis County" as well as her acquaintance with one of the defense attorneys representing appellant. Juror number 2 had no familiarity with any court system, nor did she have any knowledge of defense counsel.

7

While panel member number 25 appears similarly situated to juror number 2 in some respects, a comparison of their responses demonstrates distinct differences, differences that the trial court noted. After reviewing the voir dire record, we cannot conclude that panel member number 25 was similarly situated to juror number 2. The trial court's finding that the State's explanations were race-neutral is supported by the record, and a comparative juror analysis does not persuade us that the trial court clearly erred in overruling appellant's *Batson* challenge. We overrule appellant's first point of error.

### Accomplice-Witness Corroboration

In his second point of error, appellant contends the evidence was insufficient to corroborate the accomplice-witness testimony of his sisters-in-law, Ortiz and Gonzales.

A conviction cannot be based on the testimony of an accomplice unless that testimony is corroborated by other evidence tending to connect the defendant with the offense committed. Tex. Code Crim. Proc. art. 38.14. In conducting a sufficiency review under the accomplice-witness rule, we eliminate the accomplice testimony from consideration and examine the record to see if any evidence tends to connect appellant to the commission of the offense. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008); *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). The sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). Direct or circumstantial non-accomplice evidence is sufficient if rational jurors could have found that it tended to connect the accused to the offense. *Id.*

Here, it is undisputed that both Ortiz and Gonzales, who pleaded guilty prior to trial to aggravated robbery for their participation in the crime, are accomplices as a matter of law, and the jury was so instructed in the court's charge. *See id.* Thus, their testimony required corroboration—apart from each other's testimony—pursuant to the accomplice-witness rule. *See Chapman v. State*, 470 S.W.2d 656, 660 (Tex. Crim. App. 1971) (testimony of one accomplice may not corroborate testimony of another accomplice).

Appellant asserts that the corroboration is lacking because "there is no evidence that directly links [him] to the commission of the crime." However, the corroborative evidence need not directly link the defendant to the crime, nor must it be sufficient in itself to establish guilt. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008); *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). Moreover, appellant's argument focuses on the absence of certain evidence (for example, tire impressions from his car tires matching those at the crime scene) but overlooks the existence of inculpatory evidence in the record. Castaneda, the surviving victim, testified that the assailant's voice was "imprinted" in his mind. He identified appellant in a live line up based on his recognition of appellant's voice, saying it was "identical" to the assailant's. Further, Castaneda was able to provide police with a general physical description of his assailant that matched appellant. Also, that night, Castaneda passed a blue Mustang parked on the side of the road near the location where he pulled his vehicle over. He testified that photos of appellant's blue Mustang, depicting a unique spoiler, matched the car he saw that night immediately before the robbery and murder.

In addition, cell phone records reflect that appellant was in constant communication with Ortiz and Gonzales—and only them—during the time frame of the offense. Cell site data and

9

toll records tracked appellant's location to the general area of the crime scene at the time of the murder. *See Smith*, 332 S.W.3d at 443 ("'[P]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction.'" (Quoting *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993).)). The evidence also reflected that after the murder, appellant removed the tires and custom rims from his blue Mustang and gave them, along with a plastic tub containing the clothing that appellant and his sisters-in-law wore that night, to his cousin's wife to hide at her residence. Subsequently, during a phone call from jail, appellant told a friend to tell her to get rid of those items. *See Brown*, 270 S.W.3d at 568 (sufficient accomplice-witness corroboration may be furnished by suspicious conduct of defendant). Also, appellant's girlfriend testified that when she saw appellant that night just before the murder, he was in possession of a gun.

Considering all of the non-accomplice evidence in a manner affording appropriate deference to the jury's role as factfinder, we conclude that this evidence is sufficient to tend to connect appellant to the capital murder of Raul Torres. As such, this evidence provides sufficient corroboration of the accomplice-witness testimony of Ortiz and Gonzales. We overrule appellant's second point of error.

**Evidentiary Complaints**

In his last two points of error, appellant complains about the admission of evidence of gunshot residue (GSR) found on two shirts recovered from his car two days after the murder. In his third point of error, he asserts that the expert testimony about the GSR was inadmissible because

10

it was unreliable. In his fourth point of error, he argues that the trial court erred in admitting the shirts because they were irrelevant and unfairly prejudicial.[7]

*The Complained-of Evidence*

Thomas White, a forensic chemist in the Trace Evidence section of the Texas Department of Public Safety Crime Laboratory Services, testified about the basic process of analyzing evidence items for the presence of GSR. He explained that a sample is collected directly off of the item with a piece of carbon adhesive, which is then loaded into a scanning electron microscope that performs an automated analysis to flag any potential gunshot primer residue particles.[8] If some are detected, the analyst then confirms the elemental composition and the morphology (i.e., appearance) of the particles. White testified that this is the preferred method for analyzing GSR and is accepted within the scientific community. He stated that he used this

---

[7] Appellant's argument appears to suggest that the shirts themselves were admitted into evidence. However, the record reflects that only photographs of the shirts were admitted.

[8] White explained,

What we're testing for in the Trace Evidence section is actually gunshot primer residue. The primer is a shock-sensitive mixture of compounds that sits at the base of an unfired cartridge. The typical primer mix is lead styphnate, barium nitrate, and antimony sulfide. The firing pin strikes the primer cup where this primer sits, and that impact is enough to make the primer spark. That spark is what ignites the gunpowder which causes the explosion and fires the bullet. Well, when that primer sparks, it vaporizes. . . . The three separate components can mix in the vapor state. As soon as they escape the weapon, they hit the air, they rapidly cool and will settle on any objects that are nearby, such as potentially the hands or the clothing of the shooter.

The GSR analysis identifies the presence of any individual particles that have a mixture of lead, barium, and antimony and have the appearance of being melted.

11

methodology in this case in his analysis of two shirts recovered from appellant's car, a black short-sleeved shirt and a brown long-sleeved shirt. Photographs of the shirts, taken by White during his examination, were admitted into evidence.

White testified that on a sample collected from the inside shirttail of the black short-sleeved shirt, he confirmed the presence of one "characteristic" gunshot primer residue particle and one "indicative" gunshot primer residue particle.[9] White concluded that the particles could have been deposited either by the shirt being near a weapon when it was discharged or by contacting a surface that had GSR on it. White also confirmed the presence of one characteristic gunshot primer residue particle on the sample taken from inside the right sleeve of the brown long-sleeved shirt. His conclusion for how this particle could have been deposited on this shirt was the same as for the particles on the black shirt: it could have been deposited by the shirt being near a weapon when it was discharged or by contacting some surface with GSR on it.

*Reliability of Expert Testimony*

Pursuant to Rule 702 of the Texas Rules of Evidence, before admitting expert testimony, the trial court must be satisfied that three conditions are met: (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is appropriate for expert testimony; and (3) admitting the expert testimony will actually assist the fact finder in deciding the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim.

---

[9] According to White's testimony, a characteristic gunshot primer residue particle will have a molten morphology (the appearance of something that looks melted) and contain lead, barium, and antimony, whereas an indicative gunshot primer residue particle will "still have the proper visual appearance but will contain only two of the three elements."

App. 2006). These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id.* Reliability, which is the only condition challenged by appellant here, focuses on the subject matter of the witness's testimony. The proponent of the expert testimony must demonstrate by clear and convincing evidence that the expert testimony is reliable. *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005). To be considered sufficiently reliable as to be of help to a jury, scientific evidence must meet three criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Vela*, 209 S.W.3d at 134; *see Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

Appellant's attack on the reliability of the GSR evidence challenges the analyst's interpretation of the test results. He asserts that White's testimony failed to establish that the GSR evidence "meet[s] the standard in the scientific community for admissibility" because it fails to demonstrate a consensus as to the number of particles that labs require in order to conclude that the item containing the particles was in proximity to a weapon when it was discharged. Relying on testimony that indicated that the U.S. Army labs require a threshold finding of the presence of *four* GSR particles before making such a conclusion and that the FBI labs, back when they still performed GSR analysis, required the presence of *three* particles, appellant contends that "[b]oth the FBI and Army standards require more than a single particle of GSR to allow a scientific opinion."

In his testimony, however, White explained that given the population that Army labs are testing on ("soldiers who routinely carry and/or qualify with some type of weapon"), the higher threshold accommodates the fact that the population is in an environment where GSR would more

13

readily be picked up on their hands. White did not know the reason for the FBI's three-particle threshold. From the exchange between defense counsel and White, it appears that the Army and FBI thresholds relate to making the conclusion that the person recently fired a weapon or that the item was in close proximity to a weapon being discharged. Here, White's conclusions regarding the GSR particles on the shirts were that the GSR particles could have been deposited not only by the shirts being in close proximity to a weapon when it was fired but also by the shirts contacting a surface that had GSR on it.

More importantly, while acknowledging that the FBI and Army had certain particle thresholds for reporting conclusions about having recently fired a weapon or being in close proximity to a discharging weapon, White explicitly testified that most labs allow the reporting of one particle. He disagreed with defense counsel's assertion that there is a "disagreement in the scientific community related to this type of forensics about how many particles you should have before you report GSR as indicative of being in proximity to the firing of a weapon." When appellant's counsel referred to a 2005 FBI gunshot-residue symposium, White testified that his recollection of the symposium was that "the majority of the respondents at that symposium said that their laboratories reported out what they found and if they found one characteristic gunshot primer residue particle, they would still report that."

Also, the State offered into evidence an article for purposes of the suppression hearing, "The Current Status of GSR Examination," which was admitted without objection. The article states that "discovering just one particle with the correct elemental composition and morphology nevertheless constitutes GSR and should be reported." The article reflects that few

14

laboratories have an established particle threshold for reporting gunshot residue results and indicates that even in those that do, an examiner should report GSR particles even if the number does not meet the established level. The article asserts that "[h]aving a threshold of significance may be helpful in isolated cases" and uses the Army threshold as an example: "For instance, the U.S. Army must consider that all of its cases involve personnel who carry guns." The article also clearly states that "the technology behind the analysis of gunshot residue is unquestionably scientifically sound."

From the evidence before it, the trial court could reasonably conclude by clear and convincing evidence that the scientific theory underlying GSR testing is valid, that the technique applying the theory is valid, and that the technique was properly applied by White in this case. Thus, the record supports the court's finding that the GSR evidence was reliable. Accordingly, the court did not abuse its discretion by admitting White's testimony. *See Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010) (admission of expert testimony is reviewed on appeal for abuse of discretion). We overrule appellant's third point of error.

*Relevance and Unfair Prejudice*

To be admissible, evidence must be relevant. Tex. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401.

Rule 403 of the Texas Rules of Evidence permits the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and carries a presumption

15

that relevant evidence will be more probative than prejudicial. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). "The term 'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Davis*, 329 S.W.3d at 806; *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Davis*, 329 S.W.3d at 806.

All relevant testimony and physical evidence are likely to be prejudicial to one party or the other. *Id.*; *Jessop v. State*, 368 S.W.3d 653, 694 (Tex. App.—Austin 2012, no pet.). Thus, "[t]o violate Rule 403, it is not enough that the evidence is 'prejudicial'—it must be *unfairly prejudicial*." *Vasquez v. State*, 67 S.W.3d 229, 240 (Tex. Crim. App. 2002). It is only when there exists a clear disparity between the degree of prejudice produced by the offered evidence and its probative value that Rule 403 is applicable. *Davis*, 329 S.W.3d at 806; *see Gaytan v. State*, 331 S.W.3d 218, 227 (Tex. App.—Austin 2011, pet. ref'd). Our analysis under Rule 403 includes, but is not limited to, the following factors: (1) the probative value of the evidence, (2) the potential to impress the jury in some irrational yet indelible way, (3) the time needed to develop the evidence, and (4) the proponent's need for the evidence. *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012); *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006).

Appellant asserts that "[t]he shirts were irrelevant to prove that [he] fired the gun in this case." He avers that the evidence had "no inherent probative value" and appears to argue that

16

the evidence lacked probative value because there was no evidence showing that these shirts were "used in the offense." He then asserts that "any probative value [was] greatly outweighed by the risk of unfair prejudice caused by there being GSR on the shirts themselves." We disagree.

The fact that shirts in appellant's possession, collected from his Mustang just two days after the murder, contained particles of gunshot residue is both relevant and probative. As White testified,

> With some extremely rare exceptions, there is really nothing else other than a firearm that can produce [a characteristic gunshot primer residue] particle.
> . . . .
> . . . The only way you're going to get gunshot primer residue on you is to somehow have been associated with a weapon discharge, whether that's directly or indirectly. And studies have supported that these particles are not just kind of free-floating in the environment. They have to come from a weapon discharge.

Thus, the complained-of evidence demonstrated that at some point appellant's shirts were either in proximity to a firearm as it was discharged or contacted a surface that had gunshot residue on it—that is, they were directly or indirectly associated with a weapon discharge. This connection to a discharged firearm had a tendency to make it more probable that appellant did in fact commit the murder with which he was charged. *See Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004) ("Evidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence.").[10]

---

[10] In *Stewart v. State*, the court of criminal appeals held that even though the intoxilyzer breath test results were not "conclusive proof" that appellant was intoxicated at the time she drove, the test results were relevant evidence. The breath test results were "pieces in the evidentiary puzzle for the jury to consider[.]" 129 S.W.3d 93, 96 (Tex. Crim. App. 2004).

Further, the evidence of the presence of GSR on these shirts was not, in itself, unfairly prejudicial. The shirts with the GSR particles on them demonstrate appellant's connection to a discharged weapon, directly or indirectly, at some point in time. Thus, the evidence does not "suggest a decision on an improper basis." *See Davis*, 329 S.W.3d at 806. Moreover, even if the probative value of the shirts was slight, the danger of unfair prejudice was correspondingly slight. Consequently, there did not exist a "clear disparity" between any degree of prejudice produced by the shirts and their probative value.

Because the evidence of the shirts with GSR particles on them was relevant and was not unfairly prejudicial, the trial did not abuse its discretion in admitting them. *See Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (trial court's decision to admit or exclude evidence is reviewed on appeal for abuse of discretion). We overrule appellant's fourth point of error.

## CONCLUSION

Finding no error in the trial court's denial of appellant's *Batson* challenge, sufficient corroboration of the accomplice-witness testimony, and no abuse of discretion in the admission of the expert testimony or complained-of evidence, we affirm the trial court's judgment of conviction.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Field

Affirmed

Filed:   March 26, 2014

Do Not Publish